[Cite as *State v. Jones*, 2023-Ohio-380.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                                 No. 110742

    v. :

KELLY JONES, :

    Defendant-Appellant. :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; REMANDED
**RELEASED AND JOURNALIZED:** February 9, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-641989-A

---

## *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristen Hatcher and Daniel Cleary, Assistant Prosecuting Attorneys, *for appellee.*

Thomas A. Rein,* *for appellant.*

*Jonathan N. Garver appointed for the limited purpose of post-decision representation.

ON RECONSIDERATION[1]

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Kelly Jones ("Jones") appeals his convictions for aggravated arson, felonious assault, arson and domestic violence following a jury trial. Jones contends that the trial court erred by admitting evidence of out-of-court statements by the alleged victim, who did not testify at trial, in violation of his rights under the Sixth Amendment's Confrontation Clause and the rules of evidence. He also contends that (1) his guilty verdicts are not supported by sufficient evidence and are against the manifest weight of the evidence, (2) the trial court erred in failing to merge the aggravated arson and felonious assault offenses for sentencing, (3) the trial court failed to make the requisite findings to support the imposition of consecutive sentences under R.C. 2929.14(C)(4), (4) the trial court erred in sentencing him to an indefinite sentence because the indefinite sentencing provisions of the Reagan Tokes Law are unconstitutional and (5) the trial court erred in allowing the state to present additional evidence related to notice of prior conviction and repeat violent offender specifications after the court had returned its verdicts on those specifications.

{¶ 2} For the reasons that follow, we affirm Jones' guilty verdicts on all offenses. However, because we find that, under the facts and circumstances here,

---

[1] The original announcement of decision, *State v. Jones*, 8th Dist. Cuyahoga No. 110742, 2022-Ohio-1936, released June 9, 2022, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 7.01.

the aggravated arson and felonious assault offenses of which Jones was convicted are allied offenses of similar import, we vacate Jones' sentences on those counts and remand for a new sentencing hearing on those offenses.

## I. Factual Background and Procedural History

{¶ 3} On July 19, 2019, a Cuyahoga County Grand Jury indicted Jones on six counts: one count of aggravated arson in violation of R.C. 2909.02(A)(1), a first-degree felony (Count 1); one count of attempted murder in violation of R.C. 2903.02(A) and 2923.02, a first-degree felony (Count 2); one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony (Count 3); one count of aggravated arson in violation of R.C. 2909.02(A)(2), a second-degree felony (Count 4); one count of arson in violation of R.C. 2909.03(A)(1), a fourth-degree felony (Count 5) and one count of domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor (Count 6). Counts 1-4 also included notice of prior conviction and repeat violent offender specifications. The charges related to Jones' alleged assault and burning of then 78-year-old Ernestine Dumas at her home in Cleveland, Ohio on July 12, 2019. Jones had been living in Dumas' home at the time of the incident. Jones pled not guilty to all charges. After several continuances, the case was set for trial on June 14, 2021.[2]

---

[2] At or shortly after his arraignment, a concern was raised regarding Jones' competency to stand trial, and the trial court referred Jones to the court psychiatric clinic for a competency evaluation. On September 11, 2019, the parties stipulated to the findings and admissibility of a competency report that opined that Jones was, at that time, incompetent to stand trial but that there was a substantial probability of his restoration to competency within the statutory time frame if he were to be provided with a course of treatment. The trial court, therefore, ordered Jones to undergo inpatient treatment for

{¶ 4} On June 14, 2021, the state filed a motion for continuance on the grounds that one of the state's witnesses, Jeraldine Campbell ("Campbell") — "the first person the victim had contact with following the incident" — had undergone hip replacement surgery two weeks earlier and "would not have medical clearance to attend trial in her current condition." In its motion, the state further asserted that "the alleged victim is permanently unavailable to testify due to her medical condition," but did not provide any details regarding Dumas' medical condition or otherwise explain in the motion why she would be "permanently unavailable to testify."[3]

{¶ 5} The following day, Jones filed a motion in limine "to exclude and/or limit the testimony" of the state's witnesses "regarding statements that may have been made to them by Ernestine Dumas," arguing that admission of such evidence would violate his rights under the Sixth Amendment's Confrontation Clause and the rules of evidence.

---

competency restoration at Northcoast Behavioral Healthcare. In December 2019, a psychiatrist from Northcoast Behavioral Healthcare issued a report in which she opined that Jones was competent to stand trial, i.e., that he had the ability to understand the nature and objectives of the charges and proceedings against him and had the ability to assist in his defense. In October 2020, at the request of defense counsel, the trial court referred Jones to the court psychiatric clinic for an evaluation of his sanity "at the time of the act." According to the trial court, Jones refused to cooperate with this sanity evaluation. Given that the last report submitted to the trial court indicated that Jones was competent to stand trial, the trial court indicated that the trial would "go forward" as scheduled.

[3] There is no indication in the record as to whether the trial court ruled on this motion prior to trial; however, as detailed below, Campbell testified at trial.

{¶ 6} Before trial commenced, the trial court allowed the parties to argue Jones' motion in limine. Jones reiterated the arguments made in his motion, i.e., that his "only accuser" was Dumas, that "the admission of testimonial hearsay through other State's witnesses * * * would violate [his] Sixth Amendment rights" and that the "facts show that [Dumas'] hearsay statements do not meet the requirements to be considered an exception to the hearsay rule." With respect to Dumas' unavailability to testify, Jones noted that they had "been briefed in chambers as to the reason that [Dumas] would be unavailable for attendance at trial" but that defense counsel had not received "any documentation that would substantiate dementia, Alzheimer's or the inability of [Dumas] to not be able to testify relative to the events of July 12th, 2019." Jones requested that the trial court "limit the testimony of any witness relative to any statements made to them by Ms. Dumas since we know that she will not be present to testify in court."

{¶ 7} The state responded that it would be seeking to admit evidence of (1) Dumas' statements to her neighbor, Campbell, (2) Dumas' statements on the 911 call and (3) her "initial statements to the police officers on scene."[4] The state asserted that it was not required to establish Dumas' unavailability in order to introduce evidence of her prior statements[5] and argued that these statements "don't actually

---

[4] As discussed in greater detail below, the state, over Jones' objection, ultimately introduced evidence of additional statements Dumas made to law enforcement regarding the incident; however, the state did not address the admissibility of those statements in arguing against Jones' motion in limine or in its appellate brief.

[5] The state denied that it was "sandbagging the defense" and claimed that "[t]he defense has known for about a year that we didn't intend to call the victim."

fall under the [C]onfrontation [C]lause" because (1) the Confrontation Clause applies to "responses to police interrogations," not to statements made to someone like Campbell, and (2) Dumas' statements to the 911 operator and her "initial statements to the police officers on scene" were non-testimonial because they were made "under circumstances objectively indicating that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency." The state further argued that Dumas' statements, made while under the effect of a startling event she personally experienced, qualified as "excited utterances" under Evid.R. 803(2) and were, therefore, admissible under the rules of evidence.

{¶ 8} The trial court denied Jones' motion in limine, and trial commenced on June 16, 2021. Jones waived his right to a jury trial on the notice of prior conviction and repeat violent offender specifications; the remaining issues were tried to a jury.

**A. Trial**

{¶ 9} At trial, the state presented testimony from eleven witnesses: Campbell (Dumas' neighbor); Leticia Rice (the 911 operator who received Dumas' 911 call); paramedic Kim Florczyk (one of the EMS personnel who examined and treated Dumas at the scene); Dr. Christopher Brandt (one of the physicians who treated Dumas' burn injuries); Mark DePhillips (a former Cleveland firefighter and arson investigator, who was at the scene); Charles Jones and Terencita Jones-Green

(Dumas' nephew and niece)[6] and various police officers. In addition to the witnesses testimony, the state introduced photographs taken by the arson investigator at the scene (state exhibit Nos. 4-39), the audio recording of Dumas' 911 call (state exhibit No. 3), excerpts of footage from the body cameras of Cleveland police officers James Donnellan and Kenneth Potchatek (state exhibit Nos. 1, 1.2 and 43) and the EMS run report (state exhibit No. 47).[7] The parties stipulated to the "relevancy and admissibility" of over 1800 pages of medical records, including photographs, detailing Dumas' injuries, diagnoses and medical care and treatment related to the incident (state exhibit No. 46). A summary of the relevant evidence follows.

### 1. Testimony of Neighbor

{¶ 10} Campbell lived "[a]cross the street down a little bit" from Dumas and was an "acquaintance" of Dumas. The two women had known each other since they were children and had "grown up together." Campbell testified that on July 12, 2019, Dumas came to her house, told Campbell she needed to go to the hospital and

---

[6] Charles Jones and Terencita Jones-Green are not related to Kelly Jones.

[7] As reflected in the trial transcript, during the witness testimony, the recording of the 911 call was identified as state exhibit No. 2 and state exhibit No. 3 was excerpts of footage from Donnellan's body camera (video only) that was played for the jury during his direct examination. When the exhibits were admitted into evidence at the conclusion of the witnesses' testimony, the recording of the 911 call was marked as state exhibit No. 3 and state exhibit No. 2 (then identified as body camera footage) was withdrawn. Defense exhibit A, the "entire version" of Donnellan's body camera footage (audio and video), was offered by the defense and admitted into evidence. To the extent we reference the exhibits here, we refer to the exhibits by their designations at the time they were admitted into evidence.

asked Campbell if she would take her to the hospital. Campbell stated that Dumas appeared "calm," looked "well put together" and that she was initially unaware that Dumas had been burned. Campbell testified that Dumas told her "Kelly had thrown fire on her" but "didn't go into any detail." Campbell indicated that she knew who "Kelly" was, i.e., a man who had been living in Dumas' home, and identified "Kelly" in court as Jones. Campbell stated that she told Dumas she did not drive at night, "so she would do better if we called 911," and she then called 911. Campbell indicated that Dumas stayed at her home until an ambulance arrived and that Campbell went with Dumas to the hospital. Campbell testified that she knew Dumas had "some cognitive something" and was in "some stage" of dementia and stated that she advised police and fire department personnel on the scene of that fact so they knew "what they were dealing with."

## 2. Testimony of the 911 Operator and the 911 Call

{¶ 11} Leticia Rice ("Rice") was working as a 911 operator on the evening of July 12, 2019, when she received a call from Dumas. The state played an audio recording of the 911 call for the jury (state exhibit No. 3), which Rice confirmed was "a fair and accurate depiction" of the call she received from Dumas:

Rice: 911. Did you need police, fire, or ambulance?

Dumas: Police.

Rice: To what address?

Dumas: Oh. I need an ambulance too.

Rice: Oh, you need an ambulance?

Dumas:  I need the police and an ambulance.  This guy I let stay in my house is going crazy and throwed gasoline and something on me trying to burn my mother's house down.  * * * [unintelligible; Rice talks over her]

Rice:  He threw gasoline on you?

Dumas:  Yes.  Set me on fire.

Rice:  Ok.  He set you on fire already, ma'am?

Dumas:  Yes ma'am, and I'm out now but it's on face, arms, and chest.

Rice:  Ok.  What's your address.  What's your address?  Tell me. * * * You are calling from someone else's phone?

Dumas:  Right.

Rice:  Is he still inside of the house?

Dumas:  He was when I left.

Rice:  Ok.  What's your name?

Dumas:  Ernestine Dumas.

Rice:   Stay on the line with me.

Dumas:  I'm on fire.  I've got to get to the hospital.

Rice:  You said you were not on fire anymore?

Dumas:  I said I've got to get to the hospital.

Rice:  Ok.  Ok.  What's the guy's name that did it?

Dumas:  Kelly Jones.  I let him stay with me 'cuz he didn't have nowhere to stay but he came in all looped out, high, and [unintelligible] went crazy on me.

Rice:  Did you remember anything like what he was wearing just in case so we can catch him if he leaves?

Dumas: He had on like a sweatsuit at the bottom.

Rice:  What color?

Dumas: I think they're black.

Rice:  Black.  Is he black, white, or Hispanic?

Dumas:  Black.

Rice then transferred Dumas to the EMS dispatcher, where the following exchange

occurred:[8]

EMS Dispatcher: Cleveland EMS.   What's the address of the emergency? * * *

Dumas: I've been set on fire and I'm burning up. * * * I'm at my neighbor's right now 'cuz he was still in the house when I left out of there.  Ma'am I'm on fire.  I've got to get to a hospital.

* * *

EMS Dispatcher:  You said you're on fire right now?

Dumas:  I'm burning up on fire like burning fire.

EMS Dispatcher:  What do you mean by you're burning up on fire?

Dumas:  He set me on fire ma'am.

EMS Dispatcher:  Are you still on fire?

Dumas:  No.  I'm out.  I put my own self out.

EMS Dispatcher:  Ok.  How old are you?

Dumas:  78

---

[8] Rice testified that she "stayed on the line" while Dumas was talking to the EMS dispatcher.

EMS Dispatcher: When did this happen?

Dumas: About an hour ago.

EMS Dispatcher: Is anything still burning or smoldering?

Dumas: No.

EMS Dispatcher: Is everybody safe and out of danger?

Dumas: There was no one there but he and I.

EMS Dispatcher: Ok, but is everybody safe and out of danger?

Dumas: [unintelligible] Yes. Ma'am I got to go. Bye.

EMS Dispatcher: I need you to stay on the line with me.

Dumas: [unintelligible] I'm turning red.

EMS Dispatcher: We're going to send an ambulance to you. * * *

{¶ 12} Campbell then got on the line, responded to further questions from the dispatcher regarding Dumas' injuries and received instructions from the dispatcher regarding care to provide to Dumas until emergency medical personnel arrived.

{¶ 13} Rice testified that she did not know Dumas or Jones, knew nothing about them and did not know whether Dumas had accurately described what had occurred.

### 3. Testimony of Police, Arson Investigator and Medical Providers

{¶ 14} Cleveland police detective James Donnellan ("Donnellan") was working as a Cleveland patrol officer on July 12, 2019 when he responded to a call

at Dumas' residence sometime after 10:00 p.m. Dumas was, at that time, across the street at Campbell's house. Donnellan testified that he and his partner, patrol officer Hicks, were the first officers on the scene. He stated that when they arrived on scene, he observed that the outside pane of glass (but not the inside pane of glass) on one of the home's front windows had been broken and that glass was scattered on the front porch, i.e., as if someone had been trying to break the window from the outside. Donnellan did not observe any object that might have been used to break the window and could not state when the window had been broken. While waiting for "back up" to arrive so that they could "clear the house," Donnellan went to the Campbell's home to speak with Dumas.

{¶ 15} Donnellan testified that when he arrived at Campbell's house, Dumas was "being treated by Fire and EMS." He described Dumas as "an older lady, very thin, very frail looking," who appeared "very out of it" and "scared." He indicated that she "didn't look to be in very good shape" and that he had observed burns on her arms and neck.

{¶ 16} Donnellan stated that he spoke with Dumas briefly as she was being treated by the paramedics. His conversation with Dumas was recorded on his body camera. During Donnellan's testimony, the state played excerpts of the body camera footage (both audio and video recordings) for the jury (state exhibit No. 1), which included the following exchange:

Donnellan: Hi miss. Do you know this guy?

Campbell: She knows him.

Donnellan: Are you pretty sure that he's in the house?

Dumas: I don't know whether he's still in there now * * * [unintelligible; officer talks over her]

Donnellan: Did he dump the gas on you in the house?

Dumas: Yes. * * * [unintelligible; officer talks over her]

Donnellan: Because there's a big hole in your window.

Dumas: He bust the window out with a stick.

Donnellan: Did he come in the front door?

Dumas: He had a key to my house * * * [unintelligible]

Donnellan: Who is this guy?

Dumas: His name is Kelly Jones.

{¶ 17} Because the volume was low and the audio portion of the body camera footage was difficult to hear, Donnellan also testified regarding what Dumas had told him when he spoke with her at her neighbor's home:

Q. Do you recall what she had said to you?

A. Yes. She told us the name of the suspect.

Q. And what suspect name did she give you?

A. Kelly Jones.

Q. You had asked her about a hole in the window. Do you recall what if anything she said about that?

A. I can't remember. It was kind of hard for me to hear. I can't remember exactly what she said.

* * *

Q. What are you asking her about?

A. I'm asking her if the suspect who did this to her is — would still — if she believes that he would still be in the house and then I also mentioned — I asked her what happened to her front window, why it was broken out, and she seemed very confused about that.

Q. Do you know if the suspect was still in the house?

A. At this time I did not know. * * * I asked who the — I asked again who did this to her, trying to get information on the suspect, and she said it was Kelly Jones.

{¶ 18} Donnellan stated that he spoke with Dumas only "briefly" because he was "more concerned" "about if the suspect was still in the house" and "getting [her] to the hospital for treatment" than "taking her through a long interview process at that time." He stated that he did not have any further discussions with Dumas because it was later determined that he and his partner would only be "assisting on the assignment" and "when we do those assisting roles like that, I try not to get too much of an involved statement from a witness or a victim so that they won't have to repeat it again down the line to the car who is actually handling the report."

{¶ 19} After speaking with Dumas, Donnellan returned to Dumas' residence. By this time, other officers had arrived at the scene, including Cleveland patrol officer Kenneth Potchatek ("Potchatek") and his partner, Cleveland patrol officer Jacob Strehle ("Strehle"), who was then in field training. Donnellan's and Potchatek's body cameras recorded their actions, observations and statements at the

scene, excerpts of which were played for the jury as the officers testified. (State exhibit No. 43 and defense exhibit A.)[9]

{¶ 20} Potchatek testified that he responded to a call that was broadcast as "a female that was set on fire." When he arrived, two other zone cars, fire and EMS were already on scene. He stated that he knew Dumas, that he had been at Dumas' residence "[t]wo or three" times prior to July 12, 2019, including responding to a report by Dumas that there were people living in her (uninhabitable) attic, and that he knew Dumas had dementia.

{¶ 21} Potchatek testified that when he arrived on scene, he spoke with Donnellan and informed Donnellan that he was a certified intervention team ("CIT") officer and that Dumas had been previously "certified CIT," i.e., referred to CIT, due to her dementia.

{¶ 22} Donnellan, Potchatek and other officers entered Dumas' home[10] and proceeded to "clear" it. Donnellan testified that when he entered the home, he noticed a "distinct odor" that smelled like a combination of "some sort of accelerant" — not gasoline but a "pungent" "chemical smell" — burning paper and burning

---

[9] While the state introduced only excerpts of Donnellan's body camera footage during Donnellan's direct examination (with the audio muted once Donnellan returned to "clear" Dumas' residence), Jones introduced a "full-length" version of Donnellan's body camera footage (including the audio recording) during his cross-examination of Donnellan (defense exhibit A).

[10] Strehle did not enter the home. He testified that he was one of the officers securing the perimeter in case the suspect was in the house and attempted to flee. He stated that he secured the perimeter for "[a]pproximately three minutes" before he and Potchatek left for the hospital to interview Dumas.

plastic. Officers went "room by room" and did a "cursory search" to see if there were any potential suspects inside. No one was inside the home.

{¶ 23} Donnellan and Potchatek described for the jury what they observed as they went through the home. Donnellan noted that the front window with the broken glass was a bedroom window. He stated that, in that room, debris was on the ground, "like somebody had scattered or torn through that part of the room," along with approximately three "half full or empty" bottles of rubbing alcohol, burnt paper and a burnt lampshade. He indicated that the fire was a "small fire" — a lampshade and some papers in a "confined area" — and was "not even a big part of the room it was in." Potchatek similarly testified that the fire was a "small fire," "isolated to a small area in one of the bedrooms of the house," and that "it took a little bit of time" to find where something had been burned. Donnellan stated the officers never determined "whose bedroom was whose," but that Jones' wallet was later found in the bedroom where the fire had occurred.

{¶ 24} Donnellan testified that the bottles of rubbing alcohol were "dented in," "[k]ind of smashed," "like you would be squeezing it." He indicated that another "squeezed" bottle of rubbing alcohol was found outside on the front porch near the broken glass.

{¶ 25} Based on what is observed on the body camera footage, the officers were in Dumas' home for less than two minutes.

{¶ 26} Potchatek testified that, considering what he had seen in the residence, i.e., that only the lampshade had been burned, and his prior interactions

with Dumas, he initially concluded that the fire "appeared accidental," i.e., that "it may not have happened the way * * * it was told initially."  He expressed this opinion to Donnellan and the other officers on the scene.

{¶ 27} Donnellan testified that once the home was cleared, he called in representatives of the Cleveland Fire Department to determine whether it was "okay to leave" the home in its current condition or whether they needed to "dump some sort of extinguisher on it."  He stated that there were no flames or smoke in the home and that he was "just being safe."  The firefighters entered the home, looked at the remains of the fire and determined that nothing needed to be done.

{¶ 28} While Donnellan interacted with the fire department personnel, Potchatek attempted to speak with Dumas.  Dumas was, at that time, in the back of an ambulance receiving medical treatment, getting ready to be transported to the hospital.  Potchatek testified that his purpose in speaking with Dumas was "[t]o get her side of the story, * * * to have her tell us what happened."  The state introduced body camera footage (state exhibit No. 43) that captured the following exchange:

Q.  Hello honey.  How are you today?

A. [unintelligible] get to a hospital.

Q. What happened?

A. He tried to burn me.

Q. Who did?

A. The guy that I let live with me.

{¶ 29} Potchatek confirmed that Dumas had then told him that "[t]he guy who lived there with me" had burned her. The interview was, at that point, interrupted; EMS personnel informed Potchatek that they were leaving the scene to take Dumas to the hospital.

{¶ 30} Potchatek returned to the scene and spoke with Donnellan. Potchatek again expressed his view that the fire was accidental and told Donnellan more about his prior interactions with Dumas. Potchatek said that Dumas was "crazy," had "serious dementia" and should not be living alone. Donnellan testified that he had had no prior dealings with Dumas but that "in the short amount of time [he] had with her, [he] didn't believe that she was displaying any of those mental issues" when he spoke with her. The officers decided that because Dumas' residence was in Potchatek's zone and Potchatek had had prior dealings with Dumas, Potchatek and Strehle would be the "primary" on the case, i.e., they would take over the investigation and write the report.

{¶ 31} Potchatek and Strehle went to the hospital to interview Dumas while Donnellan and other officers "secured the scene." The officers at the scene waited for a supervisor to arrive to decide whether the home should be treated as a crime scene and whether an arson investigation was warranted. At some point later, the supervisor, Sergeant Mark Bickerstaff ("Bickerstaff"), arrived on scene.[11]

---

[11] Potchatek testified that Sergeant Bickerstaff was not at the scene. However, the arson investigator testified that he consulted with Sergeant Bickerstaff at the scene. Strehle testified that he believed Sergeant Bickerstaff arrived on scene after he and Potchatek had left the scene.

{¶ 32} Mark DePhillips ("DePhillips") was an arson investigator for the Cleveland Fire Department at the time of the incident. He testified that when he arrived on the scene, he spoke with the responding police officers to try and figure out what had happened, then went to inspect the residence. He stated that as he walked toward the residence, he saw "broken windows" and a bottle of rubbing alcohol that had been "obviously squeezed and drained." He testified that when he entered the residence, he saw little to no smoke or soot damage and that there was "no real heavy fire damage," just "some charring * * * with magazine, newspaper type things" and a lampshade that had melted. He said there was no odor of smoke and that, although there was a "faint odor" of rubbing alcohol, it dissipated fairly quicky with the doors open.

{¶ 33} With respect to accelerants, DePhillips testified that, when inspecting the residence, he observed three or four bottles of "highly flammable" rubbing alcohol, "squeezed or pressed like you would need to do to actually force it out of the bottles." He stated that, based on what he saw, he believed the fire was caused by the rubbing alcohol and an intentional, open flame, but that he did not know who may have squeezed the bottles, who may have ignited the rubbing alcohol or what the ignition source was. He stated that he believed the ignition source was an "intentional" open flame, such as matches, a lighter or a cigarette, because he did not see any signs of "accidental sources," such as lightning or an electrical fire.

{¶ 34} DePhillips testified that, based on his inspection, he did not see anything at the scene to indicate an "intent to light the structure on fire," but that,

at that time, he did not have the "full story," i.e., he did not know that "the burning was on the victim herself." DePhillips testified that after his inspection, he spoke with Bickerstaff and that Bickerstaff told him the Cleveland Police Department would handle the matter. He indicated that, based on what he saw with regard to the structure, he told Bickerstaff "something to the effect" that he "couldn't stretch this into an [aggravated] arson if [he] wanted to." However, DePhillips was unaware, at that time, that Dumas had been badly burned. He stated that if he had known that fact, the matter "would have been pursued as an aggravated arson."

{¶ 35} At the hospital, Potchatek and Strehle interviewed Dumas "at great length" for "[m]aybe an hour" as she was "being treated" and "learn[ed] more details" about what occurred. Strehle testified that Dumas had been treated for pain and was in the "emergency bay" when the officers interviewed her. Strehle stated that Dumas was "very much in pain" but "lucid and calm." Potchatek offered similar testimony regarding Dumas' demeanor. Potchatek explained that, due to HIPPA restrictions, the officers were unable to record their interview with Dumas at the hospital.

{¶ 36} Potchatek testified that he and Strehle were using the hospital interview of Dumas as "investigative means." He stated that, during the interview, Dumas identified Jones as the suspect, provided a description of Jones, described how she was injured, including that "a clear liquid" was the "accelerant or mechanism that caused [her] burns," and told officers that her vehicle had been damaged. Strehle testified that Dumas told the officers that "she had been burned

by her live-in tenant Kelly Jones," that while Jones was "in the midst of destroying her property," i.e., after he set her lampshade on fire and she tried to stop him, Jones "attacked her" and "set her on fire" and that "after he set her on fire[,] he went to set her car on fire."

{¶ 37} Strehle stated that no one had advised him, during or prior to his interview of Dumas, that she had a history of dementia or had been previously referred to CIT. Although acknowledging his prior concerns regarding Dumas' mental condition, Potchatek stated that he did not believe Dumas was "manifesting" any of her "psych issues" during the interview because "[e]very detail she gave us played out."

{¶ 38} Strehle "broadcast" the information they had obtained from Dumas to the officers who remained at the scene and requested that they look at Dumas' car for any burn damage. Donnellan testified that he did not observe any damage to Dumas' vehicle but found "[l]ike some sort of candle or a ball of some sort of wax that looked like it could have been used to light something" on the hood of the car near the windshield wiper. Donnellan stated that the arson investigator was still at the scene, so Donnellan asked him to verify what he was seeing, and then informed Potchatek what he had found.

{¶ 39} Donnellan testified that while he and other officers were standing on Dumas' porch, "holding down the scene," a man (later identified as Jones) began walking towards the house. Donnellan testified that the man's clothing matched the

description of the clothing officers had been given for the suspect. Donnellan identified Jones in court as the man who appeared at the scene.

{¶ 40} Donnellan testified that he approached the man and asked him to identify himself but that the man refused to do so and, instead, kept asking, "What's going on? What's going on?" Donnellan stated that he detained the suspect, read him *Miranda* warnings and, based on identification contained in a wallet found inside the house, identified the man as Jones. Donnellan indicated that, based on his brief conversation with Jones, Jones appeared to be intoxicated. Donnellan testified that they arrested Jones "based on the victim's statements and the evidence on scene" "[b]ecause of the information we had on the suspect and the fact that the victim gave us his name and we were able to positively identify him when he came back on scene through his ID and because of the clothes he was wearing."[12]

{¶ 41} After arresting Jones, Donnellan contacted Potchatek, who was still at the hospital interviewing Dumas, to advise him of the developments and determine what Potchatek wanted him to do with Jones. Donnellan testified that after Potchatek confirmed that Jones' clothing matched the description of the suspect's clothing given by Dumas,[13] Donnellan put Jones in the back of his patrol car and took him to the county jail.

---

[12] Potchatek testified that the supervisor, Bickerstaff, ultimately made the decision to arrest Jones. To his knowledge, Bickerstaff had no contact with Dumas prior to making that decision.

[13] Strehle testified that the officers did not get a description of the suspect from Dumas, but rather, "from the witness," presumably Campbell, since she accompanied Dumas to the hospital.

{¶ 42} The state played excerpts of Donnellan's body camera footage for the jury that captured Donnellan's conversation with Jones while transporting Jones to the jail (state exhibit No. 1.2).

{¶ 43} Donnellan testified that while he was transporting Jones to the jail, Jones began to make "counter-accusations against the victim saying that the victim attacked him." Donnellan stated that Jones was "a bigger guy, husky," who weighed "probably 220, 230 pounds, give or take." He estimated that Dumas then weighed 90 or 100 pounds. Donnellan stated that Jones did not show any signs of attack or injury but that he advised Jones that his statement "would go in the report." Potchatek met them at the jail, took custody of Jones and "basically took over from there." Potchatek testified that after he took custody of Jones, Jones told him that Dumas had assaulted Jones but that he, likewise, did not see any visible injuries on Jones.

{¶ 44} Donnellan stated that after clearing the residence, he questioned whether Dumas "did this herself," "thinking that it could have been a possibility." However, he testified at trial that he believed Jones intentionally caused Dumas' injuries and that he did not consider "any other cause for the fire or [Dumas'] injury" because, based on "the evidence that we found on scene," i.e., the burnt paper and the rubbing alcohol, "it didn't seem accidental that she could have done it herself." Donnellan indicated, however, that when the officers entered Dumas' home they were "just looking for a person" and "the source of a fire," i.e., they were "not looking for any evidence or anything," because they did not have a search warrant.

{¶ 45} Donnellan acknowledged that Dumas' description of the incident did not match what he had observed at the scene in several material respects. Donnellan testified that although Dumas told police that Jones had doused her with gasoline, had attempted to set her house on fire and had damaged her vehicle, there was no gasoline in the home, the house had not been set on fire and Dumas' vehicle had not been damaged. Neither Donnellan nor Potchatek could identify the ignition source for the fire. Donnellan stated that he did not "survey the house" for a lighter, cigarette butts or anything else that could have started the fire in the bedroom. Potchatek stated that the officers did not find any matches or any other ignition source that might have started the fire in the home. Donnellan and Potchatek indicated that they did not know whether Dumas smoked.

{¶ 46} Strehle was charged with writing the police report regarding the incident. He stated that, in preparing the report, he spoke with Dumas and the other officers on scene but that he did not speak with any fire department personnel or the arson investigator. Strehle indicated that, while at the scene, he and the other officers had been discussing the "possibility" that Dumas may have accidentally "set herself on fire" and that, in considering that possibility, they "took into account the physical evidence," i.e., the rubbing alcohol and the fire to the lampshade and "the burns on the victim." Strehle stated that after interviewing Dumas, however, he was no longer concerned that Dumas may have set herself on fire because "[s]he was very adamant of the name and the way he set her on fire." Potchatek testified that

after he spoke with Dumas at the hospital — and "got the story" — and Jones appeared at the scene, he likewise decided the incident was not an accident.

{¶ 47} After the report was submitted, the case was referred to the detective bureau, and Donnellan, Potchatek and Strehle had no further role in investigating the case.

{¶ 48} Kim Florczyk ("Florczyk"), a paramedic for the city of Cleveland, was one of the responding EMS personnel who treated Dumas at the scene. During her testimony, Florczyk read from an EMS run report, which states: "PT [Patient] reportedly ha[d] a flammable liquid thrown on her and then was lit on fire. Per PT, PT put herself out by smacking self." Florczyk stated that Dumas had second-degree burns to her chest, neck, lips and wrists and a third-degree burn to her right earlobe. She indicated that Dumas rated her pain as a 10-out-of-10 even after receiving 50 micrograms of fentanyl, so they administered another 50 micrograms of fentanyl to her. Due to her injuries and distress level, Dumas did not sign the "billing signature" on the report; a member of the nursing staff signed for her.

{¶ 49} Dr. Christopher Brandt ("Dr. Brandt"), a burn surgeon at MetroHealth Medical Center, was one of Dumas' treating physicians. He began treating Dumas for her injuries several days after her admission to the hospital. Dr. Brandt described Dumas' injuries and testified that Dumas had sustained "life-threatening" second-degree and third-degree burns to 16.5 percent of her body, including her chest, shoulders and upper arms, neck, face, hands and forearms. He

stated that Dumas underwent multiple surgeries during her six-week hospitalization.

{¶ 50} Cleveland police detective David Sims ("Sims") was assigned to follow up on the case after Potchatek and Strehle turned in their report.[14]  He went to the hospital to interview Dumas.  Jones, by that time, had already been arrested.  Sims testified that he "went to get all the facts, as much as I could, about what happened that night, or the day, and find out if she knew who had committed this crime against her."

{¶ 51}  With regard to his first interview of Dumas, Sims testified:

Q.  * * * We're not going to get into the details of what she said, but did she identify a suspect?

A. Yes.

Q. And who was the suspect that she identified?

A. Kelly.

Q.  Did you get a last name or no?

A.  That's how she had — that's how she identified him, as Kelly.  But yes, I learned — I later found out the suspect that was arrested was the defendant.

{¶ 52} He stated that Dumas was "in very bad pain" the first time he questioned her but that she "was well aware of what happened, she was able to speak

_____

[14] It is unclear whether Detective Sims reviewed the police report in this case.  On direct examination, he testified, "After reviewing the report, I proceeded to the hospital to interview Ms. Dumas"; however, on cross-examination, he denied having "review[ed] the report prepared and filed by Officer Strehle."  He testified, however, that he had had a conversation with Potchatek about the case.

with me, tell me what happened, who done it." He indicated that Dumas had recalled him from a burglary case he had handled two years earlier, in which several juveniles broke into Dumas' home and stole various items.

{¶ 53} Sims testified that he visited Dumas approximately another three times at the hospital and then on three more occasions at a nursing facility. With regard to his subsequent interviews of Dumas, Sims testified:

Q. And each time you visited her, was she talking to you about what had happened or were you talking about other things?

A. Every time I visited, we talked about that particular day, what happened.

Q. And again, we're not really going to get into exactly what she said, but did it remain consistent?

A. Yes, it did.

Q. And did she identify the suspect each time?

A. Yeah. She always identified him as Kelly.

{¶ 54} Sims stated that his purpose in interviewing Dumas multiple times was his "continuing investigation," i.e., "I wanted to see what her condition was to make sure, you know, her statement was the same, if she knew who I was and, you know, who had done this, committed this crime against her." He indicated that he did not have any concern regarding her mental condition but was concerned regarding her physical condition "because of the status she was in" and that he believed her physical condition had been "deteriorating."

{¶ 55} Sims testified that, other than calls to the nursing staff to check up on Dumas, his interviews of Dumas concluded his investigation in the case. He did not interview Jones[15] or anyone else who may have witnessed the incident or who may have known Dumas or Jones when investigating the incident. Other than the brief walk-through of Dumas' residence on the evening of the incident, there is nothing in the record to indicate that police inspected the residence or recovered or tested any physical evidence from the residence. Sims testified:

> A. * * * After I got all the facts from her, as much as I could, I then conferred with the prosecutor and presented the package for them to charge and then I had other stuff to do for the grand jury packet.
>
> Q. Once you finished that charging, does that conclude your involvement?
>
> A. Yes.[16]
>
> * * *
>
> A. * * * I had interviewed the victim and she was well aware of what happened, was able to speak clearly, told me what happened, and I took what I had, the information I had, to the prosecutor and they deemed it was enough to go forward with the charges.

{¶ 56} Sims testified that he was "unaware of any possible mental-health issues" with Dumas when speaking with her and stated that although he had spoken

---

[15] Sims testified that he had once attempted to speak with Jones, i.e., that he had once called down to the jail to make an appointment to speak with Jones, but "was told that he was refusing an interview." Sims stated that he was unaware that Jones had made a statement to police and did not consider it in his investigation.

[16] Based on Sims' report, which was not admitted into evidence, it appeared that Sims had been assigned the case on July 13, 2019 and that Jones was charged on July 14, 2019. Sims testified that he spoke with Dumas' family members "after [he] charged Mr. Jones."

with Potchatek regarding the case, he was unaware that Dumas had been previously referred to CIT because of her mental condition.

### 4. Other Evidence

{¶ 57} Charles Jones ("Charles"), Dumas' nephew, testified that, prior to the incident, he would visit Dumas once "every couple months or have a phone call" with her but could not recall when he last saw her prior to the incident. He indicated that, in the summer of 2018, concerns arose regarding Dumas' "forgetfulness" and he, therefore, "took over" bill payment for Dumas, paying her bills out of her checking account to "make sure she didn't miss any." He stated that, at that time, Dumas still had a car but that he "wasn't sure if she was safe on the road driving" because he "wasn't sure if she was remembering everything with the driving." He indicated, however, that he did not have any concern, prior to the incident, for Dumas' "well-being" or believe that she "shouldn't be living alone." He stated that Dumas was then "pretty independent" and that she liked to go out with her friends. Charles indicated that he did not "know of" Jones and was not aware, prior to the incident, that he or anyone else was living with Dumas.

{¶ 58} Charles testified that he was appointed Dumas' legal guardian for medical decisions in March 2020 and that he was in the process of seeking total legal guardianship of her at the time of trial. He stated that, following the incident, Dumas had spent six months in three different hospitals, had undergone multiple skin graft surgeries and had stayed in three other rehabilitation centers before being transferred to the rehabilitation center where she then resided.

{¶ 59} Charles testified that Dumas was diagnosed with dementia after the incident but that, to his knowledge, she had not been diagnosed with dementia prior to the incident. He stated that he was unaware that Dumas had made a prior report to police that someone was living in her attic. According to Charles, Dumas' mental condition worsened following the incident, i.e., "at a point, she was very forgetful." Although Charles acknowledged that "you never improve" once you have dementia, he stated that Dumas was "doing better now," that she always recognizes him and that he could have a "good conversation" with her.

{¶ 60} Terencita Jones-Green ("Jones-Green"), Dumas' niece and a retired Cleveland police officer, testified that, for the past year, Dumas had been residing at a nursing home in Richmond Heights. She stated that, prior to the incident, Dumas was independent and that she had had no concerns regarding Dumas' mental condition. According to Jones-Green, although Dumas, at that time, showed some signs of forgetfulness, i.e., misplacing her keys and "[t]hat type of issue," she had nothing more than "oldzeimers" — "a nice way to say that our mind is not functioning as well as it used to." Jones-Green stated that, prior to the incident, Dumas had a car and that although she "didn't drive a lot," she drove "wherever she needed to," e.g., to the bank, to the grocery store or to her cousin's house. Jones-Green indicated that she had no concerns, at that time, about Dumas driving.

{¶ 61} Jones-Green denied that concerns regarding Dumas' forgetfulness led Charles to take over Dumas' bill paying in 2018. Jones-Green stated that she had decided to set up automatic bill payment for Dumas (as she had for all her senior

family members), so that Dumas would not "have to worry about anything but enjoying [her] life."

{¶ 62} Jones-Green testified that, prior to the incident, she had begun packing Dumas' belongings because Dumas' residence had bed bugs and Jones-Green had arranged to have the house exterminated. She stated that she knew Jones as a "nice" "neighborhood person" who "help[ed] out the seniors" and who would, at times, "go to the grocery store for [Dumas] and do certain things for her." She indicated that Jones had also once used Dumas' car to drive her to the hospital when Dumas needed medical care. Jones-Green testified that she did not know Jones was staying with Dumas until after the incident and did not see any of his things when packing Dumas' belongings in preparation for the exterminator. She stated that the front bedroom was not Dumas' bedroom and that she did not go into that room when packing up the house other than to turn up the mattress per the exterminator's instructions. Jones-Green indicated that Dumas smoked marijuana but not cigarettes.

{¶ 63} Jones-Green testified that, as a result of the incident, Dumas can no longer use her hands, that several of her fingers "don't move," that a lip and part of her neck "won't move" and that she has a feeding tube in her stomach. She stated that when visiting Dumas, Dumas has never had trouble recognizing her and has always known who she is. Jones-Green indicated that she had never been made aware that Dumas has dementia but acknowledged that she had not been "actively involved" in her aunt's medical care for several years.

{¶ 64} The state introduced medical records, detailing Dumas' injuries, diagnoses and medical care and treatment related to the incident. The medical records include an "emergency department — visit note" authored by Julia Coppi, M.D., dated July 12, 2019, at 11:47 p.m., which states, in relevant part, as follows:

> The history is provided by the Patient and EMS. Ernestine Dumas is a 78-year-old female presenting to the ED as a CAT 2 trauma activation. Mechanism was * * * physical assault with * * * thermal burns. Brought in by CEMS. This occurred approximately 1 hour * * *, the patient was in a fight with a person who was a friend of a friend living in her house. The argument escalated and she was doused with a flammable liquid ?gasoline [sic] or rubbing alcohol and lit on fire with a piece of paper thrown on her while on fire. She states he attacked her and punched her in the face, but currently denies facial pain * * * Patient currently complaining of pain over chest, arms, anywhere with burns. * * *

{¶ 65} At the conclusion of the state's case, Jones moved for a mistrial based on his "ongoing objections to the hearsay" statements that had been admitted into evidence during the trial, asserting that "there is no instruction that is able to cure the damage caused by the admissibility of that hearsay evidence." He also moved for acquittal pursuant to Crim.R. 29. The trial court denied both motions.

{¶ 66} Jones did not testify at trial and did not present any witnesses on his behalf.

## B. Guilty Verdicts

{¶ 67} The jury found Jones guilty of aggravated arson in violation of R.C. 2909.02(A)(1) (Count 1), felonious assault (Count 3), arson (Count 5) and domestic violence (Count 6). The jury found Jones not guilty of attempted murder (Count 2) and aggravated arson in violation of R.C. 2909.02(A)(2) (Count 4). After the jury

was discharged, the trial court found Jones guilty of the notice of prior conviction and repeat violent offender specifications on Counts 1 and 3. The trial court referred Jones for a presentence investigation report and scheduled a sentencing hearing.

{¶ 68} On July 15, 2021, the date scheduled for the sentencing hearing, the trial court withdrew its prior verdicts on the notice of prior conviction and repeat violent offender specifications and, over Jones' objection, allowed the state to present witness testimony and other evidence related to those specifications.

{¶ 69} After the presentation of this evidence and the parties' closing arguments regarding the notice of prior conviction and repeat violent offender specifications, the trial court once again found Jones guilty of the notice of prior conviction and repeat violent offender specifications, and the case proceeded to sentencing.

### C. Sentencing

{¶ 70} At the sentencing hearing, the trial court rejected Jones' argument that the offenses for which he had been found guilty were allied offenses of similar import that should be merged for sentencing. After hearing from Dumas' sister and niece, the state and defense counsel, the trial court sentenced Jones at the sentencing hearing to an aggregate sentence of 31 years to 36.5 years as follows: on Count 1 (aggravated arson) — 21 to 26.5 years (11 years to 16.5 years for the underlying offense plus ten years for the repeat violent offender specification); on Count 3 (felonious assault) — eight years; on Count 5 (arson) — 18 months and on Count 6 (domestic violence) — six months. The trial court ordered that the

sentences on all counts be served consecutively.  (Tr. at 773-778.)  The trial court

also sentenced Jones to five years' mandatory postrelease control, advised him of

his registration requirements for the arson registry and stated that "[t]he defendant

is credited for jail time served."

{¶ 71}  In its July 22, 2021 sentencing journal entry, the trial court imposed

a sentence on Count 6 of "time served" and sentenced Jones to an aggregate

sentence of 30.5 to 36.5 years.[17]

{¶ 72}  With respect to its decision to impose consecutive sentences, the trial

court stated, at the sentencing hearing:

> So what do you do with a person like this who has been to prison
> five times, who has been involved in a shooting, who has been involved
> in all the crimes I've mentioned, and now he's out in the community
> lighting people on fire?  What you do is you put them in prison for as
> long as you possibly can.
>
> That's my job.  My job is to protect the peace and dignity of the
> State of Ohio and I intend to do that by imposing a maximum
> consecutive period of incarceration in this case for the foregoing
> reasons.  * * * All right.  Pursuant to 2929.14(E)(4) [sic], the harm here
> is so great and it's so unusual that no single term adequately reflects
> the seriousness of this defendant's conduct, and he has a criminal
> history that shows that consecutive terms are necessary to protect him
> [sic] from the public.
>
> This is the worst form of the possible offense. The offender
> possesses a great likelihood of committing future crimes given his track
> record.
>
> Additionally, the victim in this case was a senior citizen.  She was
> elderly.  He preyed upon her.  And it's just so pathetic, the one person
> — the one person that was giving you a lifeline, permitting you to stay

---

[17] Neither party raises the difference in the sentence imposed at the sentencing hearing and that imposed in the sentencing journal entry as error on appeal.  Accordingly, we do not further consider the issue here.

at her house, trying to help you out, and what do you do? You did what the jury has convicted you of and you should be ashamed of yourself. * * * You have a 29-cycle history of criminal convictions. * * * So I think those are the reasons set forth for a consecutive period of incarceration. * * * I want to impose a * * * consecutive sentence because I want to again indicate that this is clearly the worst form of the offense and the person that he committed this act of domestic violence on was an elderly individual.

All those sentences are consecutive for the reasons mentioned.

{¶ 73} The trial court did not set forth its findings in support of the imposition of consecutive sentences in its sentencing journal entry. In its July 22, 2021 sentencing journal entry, the trial court simply stated, "Court placed on the record 2929.14 E4 [sic] in regards to consecutive sentence."

{¶ 74} Jones appealed, raising the following seven assignments of error for review:

Assignment of Error I: The trial court erred in the admission of hearsay evidence and testimonial statements, in violation of Appellant's right to confront his accusers, as protected by the Sixth Amendment of the United States Constitution.

Assignment of Error II: The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(a), on the charges, and thereafter entering a judgment of conviction of those offenses as those charges were not supported by sufficient evidence, in violation of defendant's right to due process, as guaranteed by the Fourteenth Amendment to the United States Constitution.

Assignment of Error III: Appellant's convictions are against the manifest weight of the evidence.

Assignment of Error IV: The trial court erred by ordering convictions and a separate sentence for separate counts because the trial court failed to make a proper determination as to whether those offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14.

Assignment of Error V:  The trial court erred by ordering Appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and HB 86.

Assignment of Error VI:  The trial court erred by imposing an indefinite prison sentence upon Appellant which is unconstitutional.

Assignment of Error VII:  The trial court erred by allowing the State to re-open its case to present additional evidence after all verdicts had already been rendered.

## II.  Law and Analysis

### A.  Admissibility of Dumas' Out-of-Court Statements

{¶ 75}  In his first assignment of error, Jones argues that the trial court erred in admitting evidence of various out-of-court statements Dumas made following the incident.  Specifically, Jones challenges the trial court's admission of evidence of six sets of statements in which Dumas described the incident and/or identified Jones as the person responsible for her injuries: (1) Dumas' statements to her neighbor, Campbell, at Campbell's home, (2) Dumas' statements to the 911 operator and EMS dispatcher during her 911 call, (3) Dumas' statements to Donnellan while at Campbell's home, (4) Dumas' statements to Potchatek while in the back of the ambulance awaiting transport to the hospital, (5) Dumas' statements to Potchatek and Strehle while she was at the hospital on the evening of the incident and (6) Dumas' statements to Sims on approximately seven different occasions while Dumas was at the hospital or at a nursing facility.

{¶ 76}  Jones contends that each of those statements, which describe "what had occurred in the past," were (1) "offered to prove the truth of the matter asserted,"

(2) "do not fall within any recognized exceptions" to the hearsay rules and (3) were testimonial and should have, therefore, been "excluded from evidence pursuant to the Confrontation Clause."  Jones contends that the trial court's error "unfairly violated his absolute right to a fair trial" and, as a result, his convictions "must be overturned."

{¶ 77} The state responds that (1) the admission of Dumas' statements to Campbell "do not implicate the Confrontation Clause" because "they are not 'prior testimony at a preliminary hearing, before a grand jury, or at a formal trial, and responses to police interrogations,'" quoting *Cleveland v. Merritt*, 2016-Ohio-4693, 69 N.E.3d 102, ¶ 8 (8th Dist.), (2) Dumas' statements to the 911 operator/EMS dispatcher were "not testimonial within the meaning of the Confrontation Clause" because the primary purpose of Dumas' 911 call was to "enable police assistance" and "to secure emergency medical assistance for her serious burns" and (3) Dumas' statements to Donnellan (while at Campbell's house) were "not testimonial" because the purpose of Donnellan's "brief conversation" with Dumas was "merely to elicit some basic information," including "who the suspect was and his whereabouts so that an effective police response could be mounted."  The state further argues that "all three" sets of out-of-court statements were properly admitted under the rules of evidence as "excited utterances."  The state does not address the admissibility of Dumas' statements to Potchatek, Strehle or Sims — all of which were also admitted, over Jones' objection, by the trial court — in its appellate brief.

{¶ 78} We begin with a review of the law that applies in determining the admissibility of Dumas' out-of-court statements. We then address the admissibility of each of these sets of statements in turn. *See United States v. Arnold*, 486 F.3d 177, 189 (6th Cir.2007) ("Each victim statement * * * must be assessed on its own terms and in its own context to determine on which side of the [testimonial-nontestimonial] line it falls.").

### 1. The Confrontation Clause

{¶ 79} The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The ""central concern"" of the Confrontation Clause is ""to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."" *State v. Smith*, 2019-Ohio-3257, 141 N.E.3d 590, ¶ 10 (1st Dist.), quoting *State v. Madrigal*, 87 Ohio St.3d 378, 384, 721 N.E.2d 52 (2000), quoting *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *see also Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011) ("Even where * * * an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from

being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial.").

{¶ 80} The admission of a testimonial, out-of-court statement by a declarant who does not testify at trial violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also Garfield Hts. v. Winbush,* 187 Ohio App.3d 302, 2010-Ohio-1658, 931 N.E.2d 1148, ¶ 17 (8th Dist.) ("If a statement is testimonial, then the Confrontation Clause requires a showing of both the declarant's unavailability and the defendant's opportunity to have previously cross-examined the declarant. * * * If the statement is nontestimonial, it is merely subject to the regular admissibility requirements of the hearsay rules."), citing *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21.

{¶ 81} Once Jones objected to the admissibility of Dumas' out-of-court statements, the state, as the proponent of the evidence, bore the burden of establishing the admissibility of the statements. *See, e.g., State v. Hill*, 12th Dist. Butler No. CA80-05-0053, 1981 Ohio App. LEXIS 14266, 4 (Mar. 1, 1981) ("The burden of proving facts which must be established to make evidence admissible is upon the party seeking to introduce the evidence."); *cf. State v. Stover*, 9th Dist. Wayne No. 13CA0035, 2014-Ohio-2572, ¶ 12 (the state, as the party seeking to admit statement under excited-utterance exception to the hearsay rules, had the burden to prove that the statement was made while the declarant was still under the stress of

the event); *see also United States v. Duron-Caldera*, 737 F.3d 988, 993 (5th Cir.2013) ("'[T]he government bears the burden of defeating [a] properly raised Confrontation Clause objection by establishing that its evidence is nontestimonial.'"), quoting *United States v. Jackson*, 636 F.3d 687, 695, fn. 4 (5th Cir.2011); *Arnold*, 486 F.3d at 192 (noting that "the government ha[d] met its burden of proving that [declarant's] statements to the 911 operator and at the scene were nontestimonial"). We review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

**{¶ 82}** Regardless of whether Dumas was "available" to testify at trial,[18] there is no dispute that Jones did not have a prior opportunity to cross-examine her regarding the statements at issue. Accordingly, if the statements Dumas made were testimonial, Jones was denied his right of confrontation.

### 2. "Testimonial" Statements and the Primary Purpose Test

**{¶ 83}** In *Crawford*, the Court held that statements made by the defendant's wife during a police interrogation while in police custody were testimonial and could not be admitted under the Confrontation Clause when the wife did not testify at trial. *Crawford*, 541 U.S. at 38-41, 65-66, 68-69, 124 S.Ct. 1354, 158 L.Ed.2d 177. *Crawford* did not offer an "exhaustive definition" of what constitutes a "testimonial" statement. *Ohio v. Clark*, 576 U.S. 237, 243, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015);

---

[18] Although there appear to have been discussions off-the-record regarding Dumas' condition, there is no medical evidence in the record that clearly establishes whether Dumas was mentally or physically unable or "unavailable" to testify at trial.

*Crawford* at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). However, the Court stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. Following *Crawford*, courts have "labored to flesh out what it means for a statement to be 'testimonial.'" *Clark* at 244.

{¶ 84} The United States Supreme Court announced the "primary purpose test" in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Where a statement is made "in the course of police interrogation," including statements made to a "police agent" such as a 911 operator,[19] whether a statement is testimonial depends on the "primary purpose" of the statements. *Davis* at 822; *Bryant* at 370. The Court explained that statements are non-testimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis* at 822. Statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

---

[19] The Court noted that "[i]f 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers." *Davis* at 823, fn. 2. For purposes of *Davis*, the Court "consider[ed] their acts to be the acts of police." *Id.* Furthermore, the fact that statements may be "volunteered" during an interaction with police does not preclude them from being testimonial. *Davis* at 822-823, 827, fn. 1 (noting that "volunteered testimony" is still testimony and remains subject to the requirements of the Confrontation Clause).

{¶ 85} *Davis* identified four characteristics that distinguish non-testimonial statements from testimonial statements: (1) the declarant describes contemporaneous events as they are actually occurring rather than describing past events, (2) an objective ongoing emergency exists, (3) the nature of what is asked and answered, viewed objectively, is necessary to be able to resolve the emergency and (4) the interview is of an informal nature. *Davis* at 826-828; *see also Cleveland v. Johnson*, 8th Dist. Cuyahoga No. 107930, 2019-Ohio-3286, ¶ 18.

{¶ 86} In *Bryant*, the United States Supreme Court clarified "what *Davis* meant" by "an ongoing emergency" and its role in determining the "primary purpose" of an interrogation. *Bryant*, 562 U.S. at 359, 131 S.Ct. 1143, 179 L.Ed.2d 93. In that case, the Court held that statements a mortally wounded shooting victim made to police officers about his assailant (i.e., the identity and description of the shooter and the location of the shooting) in a gas station parking lot (after he had been shot by the assailant outside the assailant's house and had driven himself to the parking lot) were not testimonial because the circumstances objectively indicated that the primary purpose of the interrogation was to enable police assistance to address an ongoing emergency, rather than to establish evidence for prosecution. The victim was unavailable to testify at trial because he died shortly after the shooting, so police officers testified at trial about what the victim had told them. *Id.* at 348-350.

{¶ 87} In *Bryant*, the Court indicated that "*Davis* requires a combined inquiry that accounts for both the declarant and the interrogator" and that "[i]n

many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers." *Bryant* at 367-368. The Court held that, in applying the primary purpose test, courts must objectively evaluate "all of the relevant circumstances" and determine "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred":

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs — e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards — are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred. * * * When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.

*Id.* at 359-360, 369, 370-371.

{¶ 88} Such circumstances include the medical condition of the declarant. The Court explained:

> [A] severely injured victim may have no purpose at all in answering questions posed; the answers may be simply reflexive. The victim's injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the

purpose of addressing an ongoing emergency or for the purpose of future prosecution.

*Id.* at 368-369. The Court cautioned, however, that "'taking into account [a] victim's medical state does not * * * rende[r] non-testimonial" "all statements made while the police are questioning a seriously injured complainant." *Id.* at 364, quoting *People v. Bryant*, 483 Mich. 132, 149, 768 N.W.2d 65 (Mich.2009).

{¶ 89} Addressing the significance of an "ongoing emergency" in determining whether a declarant's statements are testimonial, the Court stated that although "the existence *vel non* of an ongoing emergency" is not "dispositive of the testimonial inquiry," it is "among the most important circumstances" that "informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Bryant*, 562 U.S. at 361, 367, 374, 131 S.Ct. 1143, 179 L.Ed.2d 93.[20] The Court explained:

> The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. Rather, it focuses them on "end[ing] a threatening situation." *Id.* at 832. Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

*Bryant* at 361. In other words:

---

[20] Although the United States Supreme Court has recognized that "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony," *see Bryant* at 358; *Clark*, 576 U.S. at 244-245, 135 S.Ct. 2173, 192 L.Ed.2d 306, no one has claimed that any such "other circumstance" existed in this case. Accordingly, we do not further address that issue here.

> The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. * * * [T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.

*Id.* at 370-371. "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 363.[21]

### 3. The Objective Witness Test and Dumas' Statements to Campbell

{¶ 90} While the Ohio Supreme Court has applied the primary purpose test in determining whether statements to law enforcement personnel are testimonial, it has applied an "objective witness" test in determining whether statements made to someone other than law enforcement personnel were testimonial. *See, e.g., State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 161; *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36. Under the objective witness test, out-of-court statements made to non-law enforcement persons are considered testimonial for Confrontation Clause purposes if "made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be

---

[21] Factors the Court identified as relevant to determining whether an ongoing emergency exists include: whether physical violence is presently occurring; whether the dispute is a private or public dispute; whether there is an ongoing threat to police or the public; whether the perpetrator's location is known or unknown; whether the perpetrator and victim are separated; the motive(s) of the perpetrator (if known); whether the perpetrator is armed and, if so, the type of weapon(s) the perpetrator has; the victim's medical condition and whether medical assistance is required and whether the scene is secured. *See generally Bryant*.

available for use at a later trial.'" *Stahl* at ¶ 36, quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177; *Jones* at ¶ 161. Under the objective witness test, the focus is on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations. *Stahl* at ¶ 36; *Jones* at ¶ 161

{¶ 91} However, *Jones* and *Stahl* were decided before the United States Supreme Court's decision in *Clark*, 576 U.S. 237, 135 S.Ct. 2173, 192 L.Ed.2d 306.

{¶ 92} In *Clark*, the United States Supreme Court considered the admissibility of out-of-court statements a three-year-old had made in response to inquiries by her preschool teachers after the teachers discovered red marks on the child. *Id.* at 241. In questioning the child, the teachers were seeking to determine whether it was safe to release the child back to his guardian — who may or may not have been the child's abuser. *Id.* at 246-247. Observing that the case presented a question that the Court had "repeatedly reserved" — i.e., "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause" and, if so, "whether the same analysis applies to statements made to individuals other than the police" — the Court "decline[d] to adopt a categorical rule excluding them from the Sixth Amendment's reach," reasoning that "at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns." *Id.* at 245-246. The Court then applied the primary purpose test in evaluating whether the child's statements to his teachers were testimonial. *Id.* at 246-247. The Court held that the Confrontation Clause did not

prohibit prosecutors from introducing the child's statements identifying the defendant as his abuser where the child was not available to be cross-examined because the child's statements to his teachers were not testimonial, i.e., that "[b]ecause neither the child nor his teachers had the primary purpose of assisting in [the defendant's] prosecution, the child's statements [did] not implicate the Confrontation Clause and therefore were admissible at trial." *Id.* at 240, 246.

{¶ 93} The Court explained:

> [A]lthough we decline to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment, the fact that [the child] was speaking to his teachers remains highly relevant. Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. * * * Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. * * * It is common sense that the relationship between a student and his teacher is very different from that between a citizen and the police. We do not ignore that reality. In light of these circumstances, the Sixth Amendment did not prohibit the State from introducing [the child's] statements at trial.

*Id.* at 249.

{¶ 94} After *Clark*, this court and several others continued to apply the objective witness test in evaluating whether statements made to someone other than law enforcement personnel are testimonial under the Confrontation Clause often without specifically addressing *Clark*. *See, e.g., Carter*, 2018-Ohio-3671, 119 N.E.3d 896, ¶ 37-40 (8th Dist.); *Columbus v. C.G.*, 10th Dist. Franklin No. 19AP-121, 2021-Ohio-71, ¶ 42-45; *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438,

¶ 14-18. *But see State v. James*, 7th Dist. Mahoning No. 18 MA 0064, 2020-Ohio-4289, ¶ 25-28.

{¶ 95} In *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, the Ohio Supreme Court cited *Jones*, without mentioning *Clark*, and stated that "whether a statement to a person who is not a law-enforcement officer is testimonial depends on the expectations of the declarant: would the declarant have reasonably believed that the statement would be available for later use at trial." *Id.* at ¶ 182, citing *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 161.

{¶ 96} We need not decide in this case whether *Clark* compels the application of the primary purpose test, rather than the objective witness test, in determining whether statements made to non-law enforcement personnel are testimonial for Confrontation Clause purposes because it would not change the result here. *Cf. State v. Cook*, 5th Dist. Fairfield No. 18-CA-43, 2019-Ohio-3650, ¶ 38 (observing that "[w]hile described differently," the "objective witness" test was "sufficiently similar" to the *Clark* "primary purpose" test in the context of that case and did not lead to a different result in determining whether statements at issue were testimonial); *see also McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 185 ("'Statements to friends and neighbors about abuse and intimidation' are nontestimonial."), quoting *Giles v. California*, 554 U.S. 353, 376, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); *James* at ¶ 28 ("Statements about assaults to family members or friends are generally non-testimonial statements."), citing *State v. Craig*, 7th Dist. Mahoning No. 18 MA 0102, 2020-Ohio-1102, ¶ 63.

{¶ 97} There is nothing in the record to suggest that an objective declarant in Dumas' position would reasonably believe that her statements to her retired neighbor — made while Dumas was in significant pain and while requesting a ride to the hospital to seek emergency medical care for her burn injuries — would be available for later use at trial. The record reflects that Dumas' primary purpose — if not sole purpose — in speaking with Campbell and telling her what had happened was to get to the hospital, where she could receive medical care. The record reflects that Campbell's purpose, if any, in communicating with Dumas was to see how she could assist Dumas in obtaining necessary medical care. Accordingly, Dumas' statements to Campbell were not testimonial, and the admission of Dumas' statements to Campbell did not violate Jones' rights under the Confrontation Clause. *Cf. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 162 (wife's statements to a friend, while crying and hysterical, regarding husband's involvement in a murder were non-testimonial); *Carter*, 2018-Ohio-3671, 119 N.E.3d 896, at ¶ 39 (victim's statements made immediately after shooting, while victim was in the bathroom of the bar, barely conscious, in which he reported what had happened to a cousin and friend, were non-testimonial); *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 34-35, 38 (victim's statements to friend and therapist about her fear of defendant's volatile behavior and outbursts were not testimonial); *State v. Peeples*, 7th Dist. No. 07 MA 212, 2009-Ohio-1198, ¶ 28-31 (assault victim's statements to a friend that the defendant "beat her up real bad" and he broke her china cabinet while he was beating her were non-testimonial).

{¶ 98} However, determining that Dumas' statements to Campbell were not testimonial does not end our inquiry. We must also determine whether her statements were admissible under the rules of evidence.

{¶ 99} Even if an out-of-court statement is non-testimonial, for evidence of that statement to be properly admitted at trial, it must also be admissible under the rules of evidence, including the rules against the admission of hearsay. In this case, the state contends that the excited-utterance exception applies.

{¶ 100}An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) there must be a startling event that produces a nervous excitement in the declarant, (2) the statement must have been made while the declarant was still under the stress of excitement caused by the event, (3) the statement must relate to the startling event and (4) the declarant must have personally observed the startling event. *See, e.g., State v. Renode*, 8th Dist. Cuyahoga No. 109171, 2020-Ohio-5430, ¶ 27, citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993), and *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 166.

{¶ 101}"There is no per se amount of time after which a statement can no longer be considered to be an excited utterance." *Taylor* at 303. "The central requirements are that the statement must be made while the declarant is still under

the stress of the event and the statement may not be the result of reflective thought." (Emphasis deleted.) *Id.*

{¶ 102} In this case, each of these requirements were met as to Dumas' statements to Campbell. Here, there is no dispute that there was a startling event and that Dumas personally observed the startling event, i.e., she was the person on fire. Her statements to Campbell related to the startling event, explaining how she was injured and who was responsible and were made while she was still under the stress of excitement from the startling event. Although Campbell described Dumas' demeanor as "calm," Donnellan described her a few minutes later as appearing "very out of it" and "scared," and the record further reflects that Dumas was suffering from "life-threatening" burns and was in severe pain at the time of her statements to Campbell. In the 911 call, made minutes later, Dumas' voice exhibits clear signs of stress and distress as she sought assistance in getting to the hospital.

{¶ 103} Accordingly, the trial court did not err or abuse its discretion in admitting evidence of Dumas' statements to Campbell at trial. Dumas' statements to Campbell were non-testimonial and were admissible under the excited utterance exception to the hearsay rule.

### 4. Dumas' Statements to Law Enforcement

{¶ 104} As stated above, we apply the primary purpose test in determining whether the statements Dumas made during the 911 call and police interviews are testimonial.

## a. Dumas' Statements on the 911 Call

{¶ 105} Statements a caller makes during a 911 call are often found to be non-testimonial and are admissible if the statements satisfy a hearsay exception. *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 61 (8th Dist.). This is because a 911 caller is typically "speaking about events as they [are] actually happening" and "[a]lthough one might call 911 to provide a narrative report of a crime absent any imminent danger," 911 callers are usually facing ongoing emergencies. (Emphasis deleted.) *Davis*, 547 U.S. at 827, 126 S.Ct. 2266, 165 L.Ed.2d 224 ("A 911 call * * * and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."). Under such circumstances, the 911 caller is not testifying, the 911 caller is not acting as a witness and the statements of the 911 caller are not testimonial in nature. *Id.* at 827-828.

{¶ 106} However, as the United States Supreme Court recognized in *Davis*, not every 911 call — and not every statement made during a 911 call — is non-testimonial. *See, e.g., id.* at 828-829.

{¶ 107} In *Davis*, the victim did not testify at Davis' trial; instead, the state introduced a recording of portions of her conversation with the 911 operator. The issue in that case was whether the portion of the victim's 911 call identifying Davis as her assailant was testimonial. *Id.* at 829. At the beginning of the call, the victim told the 911 operator that "[h]e's here jumpin' on me again," that "[h]e's usin' his fists" and that her assailant had not been drinking. The 911 operator then asked the

victim the name of her assailant. After she identified her assailant as Davis, the victim told the operator, "He's runnin' now." The victim informed the 911 operator that Davis had "just r[un] out the door" and that he was leaving in a car with someone else. *Id.* at 817-818. The Court held that the portion of the 911 call that included the identification of Davis as the assailant was non-testimonial because (1) the victim was "speaking about events as they were actually happening" rather than describing past events, (2) the victim's call was "plainly a call for help against a bona fide physical threat," (3) the victim's "frantic answers were provided over the phone, in an environment that was not tranquil, or even * * * safe" and (4) the "nature of what was asked and answered * * * viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency" rather than simply learn what had happened in the past. (Emphasis deleted.) *Id.* at 827.

{¶ 108} However, the Court cautioned that other portions of the 911 call — i.e., the victim's statements to the 911 operator after Davis had left the premises — could be testimonial:

> In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told [the victim] to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, [the victim's] statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford*, 541 U.S. at 53, fn. 4, 124 S.Ct. 1354, 158 L.Ed.2d 177.

*Davis* at 828-829.[22]  The Court noted that the Washington Supreme Court had concluded that even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt.  Because Davis did not challenge that holding, the Court simply "assume[d] it to be correct" and did not further address the issue. *Id.* at 829; *see also Bryant*, 562 U.S. at 363, 131 S.Ct. 1143, 179 L.Ed.2d 93.

{¶ 109} In this case, viewing objectively all the relevant facts and circumstances, we agree with the trial court that Dumas' statements to the 911 operator and EMS dispatcher were non-testimonial, and that admission of those statements did not violate Jones' rights under the Confrontation Clause.

{¶ 110} It is clear from the record that Dumas' primary purpose in calling 911 and providing statements to the 911 operator and EMS dispatcher was to obtain immediate emergency medical assistance, i.e., to resolve an existing medical emergency.  Although Dumas requests both police assistance and an ambulance in the 911 call, Dumas called 911 only after she asked her neighbor to drive her to the

---

[22] *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), also a domestic violence case, was decided with *Davis*.  In that case, police questioned a victim of domestic violence on scene after she had been separated from her assailant.  A police officer asked her what had happened and, after hearing her account, had her fill out and sign a battery affidavit.  *Id.* at 819-820.  The victim was subpoenaed but did not appear to testify at trial.  The state called the police officer who had questioned the victim to testify regarding what she had told him and to authenticate her affidavit.  *Id.*  The Court determined that because there was "no emergency in progress" and the victim's statements "were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation," but rather, were a "deliberate[] recount[ing] * * * how potentially criminal past events began and progressed," "the primary, if indeed not the sole, purpose of the interrogation was to investigate a possible crime" and the fact that the victim's statements were in response to "initial inquires" was "immaterial."  *Id.* at 829-832.  As such, the victim's statements were testimonial and admission of the police officer's testimony regarding those statements violated the Confrontation Clause.  *Id.*

hospital and her neighbor told Dumas she did not drive at night and that they should call 911. At the time of her call, Dumas was suffering from life-threatening burn injuries. Dumas' voice, as heard on the 911 call, exhibits clear signs of distress and pain. She states that she was set on fire, that she had suffered burns to her face, arms and chest and that she needed to get to a hospital. When EMS arrived a few minutes later, Dumas rated her pain as a 10-out-of-10 and continued to rate her pain as a 10-out-of-10 ten minutes later, even after receiving 50 micrograms of fentanyl for pain management.

{¶ 111} With respect to the purpose of the 911 operator and EMS dispatcher in questioning Dumas, it is clear their questions were directed to determining (1) the cause, nature and extent of Dumas' injuries to identify the need for emergency services, (2) whether there was any other ongoing emergency to which police, fire or other first responders might need to respond, e.g., whether anything was still on fire or smoldering, whether anyone else was still be in the house or whether everyone was out and safe and (3) information necessary to provide appropriate instructions for care while Dumas was awaiting the arrival of EMS. Accordingly, the trial court did not err in determining that Dumas' statements on the 911 call were non-testimonial.

{¶ 112} Once again, however, the determination that Dumas' statements on the 911 call were non-testimonial does not end our inquiry. We must also consider whether such statements were admissible under the hearsay rules.

{¶ 113} The admission of a statement as an excited utterance "is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." *State v. Wallace*, 37 Ohio St.3d 87, 524 N.E.2d 466 (1988), paragraph two of the syllabus; *see also Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, at ¶ 176.

{¶ 114} As with Dumas' statements to her neighbor, Dumas' statements on the 911 call — which occurred within a few minutes of the statements Dumas made to her neighbor — were made at a time when Dumas was clearly still under the stress of the event that she had personally observed. As noted above, her distress and urgent need for medical assistance can be heard in her voice on the 911 call. The statements at issue related to the startling event; the questions from the 911 operator and EMS dispatcher were not coercive or leading; and there is nothing to suggest that Dumas' statements to the 911 operator and EMS dispatcher were the result of reflective thought.

{¶ 115} As such, Dumas' statements on the 911 call qualified as "excited utterances" under Evid.R. 803(2). The trial court did not err or abuse its discretion in admitting the recording of Dumas' 911 call (or Rice's testimony regarding the call) at trial.

{¶ 116} As to the evidence of statements Dumas made to Donnellan, Potchatek, Strehle and Sims, however, we reach a different conclusion.

### b. Dumas' Statements to Donnellan at Campbell's House

**{¶ 117}** In addition to the statements Dumas made to her neighbor, the 911 operator and the EMS dispatcher, the state also introduced evidence of statements Dumas made to several police officers following the incident. The first of these statements were the statements Donnellan elicited when questioning Dumas at Campbell's house after he arrived on the scene. Donnellan testified regarding his questioning of Dumas at Campbell's home and the state compounded his testimony by introducing body camera footage (state exhibit No. 1) capturing their conversation.

**{¶ 118}** The state argues that this case is similar to *Merritt*, 2016-Ohio-4693, 69 N.E.3d 102, i.e., "[l]ike the officers in *Merritt*, the arriving officers were unaware of the perpetrator's identity or location, whether he possessed a weapon, whether others were involved or posed a danger to the public and whether the scene was secure," and that Dumas' statements to Donnellan should be deemed non-testimonial because the purpose of Donnellan's "brief conversation" with Dumas was "merely to elicit some basic information * * * so that an effective police response could be mounted." We disagree.

**{¶ 119}** As stated above, we recognize that an ongoing emergency can exist after the original threat to the victim has ceased to exist if there is a continuing threat to police or the public or the victim is in need of emergency medical services. However, this does not mean that an alleged victim's responses to "initial inquiries" by police officers are always non-testimonial. *See Davis*, 547 U.S. at 832, 126 S.Ct.

2266, 165 L.Ed.2d 224 (rejecting the "implication that virtually any 'initial inquiries' at the crime scene" will be non-testimonial). *Bryant* instructs that a court must consider "all of the relevant circumstances," including whether an ongoing emergency exists and the perspectives of both the declarant and the interrogator in determining the primary purpose of an interrogation and whether a declarant's statements are testimonial. *Bryant*, 562 U.S. at 369, 131 S.Ct. 1143, 179 L.Ed.2d 93.

{¶ 120} In *Merritt*, two police officers, Buettner and Hardy, responded to an anonymous domestic violence call at a residence. Upon arrival, the officers found the victim, upset and crying, with bruises on her face, a black eye and a split lip. *Merritt* at ¶ 2. As the officers attempted to speak with the victim, the defendant, Merritt, came outside and Hardy took him aside. *Id.* The officers were not aware, at that time, that Merritt was the alleged attacker. *Id.* The victim, "upon being pulled aside" by Buettner, "hysterically related" to Buettner that Merritt "had struck her and smashed her head against the wall" after they had returned home from a bar and had an argument. *Id.* Hardy separately interviewed the victim approximately 30 minutes after the assault. The victim did not testify and Merritt was convicted of domestic violence based on the officers' testimony regarding the victim's statements. *Id.* at ¶ 4. On appeal, Merritt argued that admission of the officers' testimony violated his rights under the Confrontation Clause. *Id.* at ¶ 7.

{¶ 121} At issue in *Merritt* was the admissibility of two sets of statements by the victim: (1) the statements the victim made to Buettner "upon the initial inquiry and before the victim calmed herself" and (2) the statements the victim made to

Hardy approximately 30 minutes after the assault, after she had calmed down. *Id.* at ¶ 11. Because Hardy's testimony regarding the victim's statements was not in the appellate record, the court evaluated only Buettner's testimony. *Id.* The court reasoned that if Buettner's testimony regarding the victim's statements was admissible, any error in the admission of Hardy's "duplicative testimony" would be harmless.[23] *Id.*

{¶ 122} In determining that the victim's statements to Buettner were non-testimonial under the primary purpose test, the court rejected "a bright-line rule — that an initial inquiry occurring immediately after the officers' arrival, but after separating a domestic abuse victim from the later-identified offender, automatically ends the ongoing emergency so that none of the statements from the initial inquiry are admissible." *Id.* at ¶ 9, 14, 18-19, 24 ("Buettner's interrogation was not objectively for investigative purposes solely because police officers arrived and

---

[23] It is not clear from the opinion how the court determined that Hardy's testimony was "duplicative" of Buettner's testimony given that Hardy's testimony regarding the victim's statements was not in the appellate record. The opinion states that "[t]here is no evidence that the officers conducted a joint interview of the victim. From the record, it appears that both officers interviewed the victim separately." *Merritt* at ¶ 3. It was, however, Merritt's burden, as the appellant, to show error by reference to matters in the record. If portions of the transcript necessary for resolution of Merritt's assigned errors were omitted from the record, the court had "nothing to pass upon" as to those assigned errors and had "no choice but to presume the validity of the lower court's proceedings, and affirm." *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980), citing *State v. Skaggs*, 53 Ohio St.2d 162, 372 N.E.2d 1355 (1978); *see also Merritt* at ¶ 1 ("Although this case implicates constitutional principles of great importance, it was not presented as such by [appellant], from whom we received limited briefing that was based on an overruled Ohio Supreme Court decision and ignored case law from this district. We are not appellate advocates and have no obligation to independently research and present arguments in favor of reversal that were not provided by an appellant."), citing App.R. 16(A)(7). The court affirmed Merritt's conviction "after considering [appellant's] arguments." *Merritt* at ¶ 1.

separated the parties. The ongoing emergency does not cease merely because police officers arrive, or the victim is not currently being abused or is temporarily separated from the later-identified abuser. * * * [W]hether an ongoing emergency exists is an inquiry not readily refined into a simple proposition that the police responded or the parties were separated, and therefore, the emergency ceased.").

{¶ 123} "Objectively reviewing the record," the court found that "Buettner's primary purpose for making the initial inquiry was to ascertain whether police or medical assistance was necessary and to determine the identity of the alleged offender in order to secure the scene, not to investigate the crime for future prosecution." *Id.* at ¶ 23. The court explained:

> Our conclusion is fortified by the fact that the questioning was informal — the victim had been simply pulled aside at the then active crime scene; and when Officer Buettner questioned the victim, he was not aware of the perpetrator's identity or location, whether the perpetrator possessed a weapon, whether others were involved or posed a danger to the public, or whether the scene was secure. Only basic information describing the circumstances of the police response was elicited. At the time Merritt was pulled aside, the officers had no way of knowing who Merritt was and how he was involved. To determine that, they needed to ask the victim for basic information vital to an effective police response. * * * Moreover, Officer Buettner was also not able to determine the seriousness of the victim's injuries until after speaking with her. That the information obtained could be used in a future prosecution is irrelevant.

*Id.* at ¶ 22.

{¶ 124} This case is different. In *Merritt*, the victim had been "simply pulled aside" from her attacker, "at the then active crime scene." Police did not know who the assailant was, how he was involved or whether he had a weapon and the victim

was "hysterical," upset and crying, with visible injuries the seriousness of which was unknown. Dumas' statements to Donnellan were made an hour after the incident, after Dumas had left her house and gone to Campbell's house. At the time Donnellan was questioning Dumas, Dumas was not just "separated" from Jones[24] or removed from the scene; she was, by her own account, "safe and out of danger" and in the custody of paramedics, receiving medical care and being prepared for transport to the hospital. The fire was out (and, as evidenced by the body camera footage, Donnellan knew this) and there is nothing in the record to indicate that Jones had a

---

[24] We recognize that "separation between a victim and the attacker is not dispositive of the ongoing emergency determination" and that "[a]n ongoing emergency can exist after the original threat to the victim has ceased to exist if there is a potential threat to police or the public or the victim is in need of emergency medical services" or "authorities must determine whether to release the victim back into a potentially abusive environment." *Merritt* at ¶ 10, 19. However, this is not such a case. This case is not only distinguishable from *Merritt*, as discussed above, but from cases like *Johnson*, 2019-Ohio-3286, at ¶ 19-20 (although victim was separated from perpetrator, victim's statements to police at park "shortly" after altercation — when victim was concerned perpetrator was "still at her house, 'tearing [it] up,'" and would be at the house when her children came home, posing a physical threat to them — were not testimonial), *Cleveland v. Williams*, 8th Dist. Cuyahoga No. 101588, 2015-Ohio-1739, ¶ 21 (ongoing emergency was still in progress even though the offender had left the scene because the assault occurred "just moments before" the police arrived at the scene, the victim was still at the scene, was injured and crying and her safety had not yet been secured), *State v. Sanchez*, 8th Dist. Cuyahoga Nos. 93569 and 93570, 2010-Ohio-6153, ¶ 20 (victim's statements to police at the scene of assault were non-testimonial where although perpetrator had left the scene, "the events * * * occurred just moments before police arrived," the perpetrator had not yet been apprehended and the victim was injured and crying such that "the emergency was still in progress"), and *Cleveland v. Colon*, 8th Dist. Cuyahoga No. 87824, 2007-Ohio-269, ¶ 23 (circumstances objectively indicated that the primary purpose of interrogation was to enable police to assist victim in an ongoing emergency where offender had left the scene before the police arrived, the incident had just concluded and the victim was found "hysterical," bleeding, upset and crying with objective signs of abuse when officers first made contact and victim related what had occurred). In this case, Dumas was being transported to the hospital; she was not being "released back" to her home.

weapon or, at that time, otherwise posed an immediate threat to Dumas or to the public. Accordingly, at the time of Donnellan's questioning of Dumas, Dumas was no longer "acting * * * to secure protection or medical care." *Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, at ¶ 183. Although Dumas had not yet been transported to the hospital, from Dumas' perspective, the emergency for which she had sought assistance had effectively ended before Donnellan began questioning her. *Cf. State v. Steele*, 8th Dist. Cuyahoga No. 91571, 2009-Ohio-4704, ¶ 39 (statements victim made to police officer while in the ambulance and at the emergency room were testimonial because emergency no longer existed).

{¶ 125} The dispute that reportedly led to the assault was a private dispute, the alleged assailant was known to Dumas and there is nothing in the record to indicate that he was believed to have a weapon[25] or that he otherwise presented an immediate physical threat to Dumas or the public at the time of Donnellan's interrogation.

{¶ 126} Further, in determining the "primary purpose" of a declarant's statements, it is not only the context of the interrogation, but the substance of what

---

[25] On cross-examination, Donnellan testified that he told fire department personnel that someone might have weapons in the house. However, he could not state where or from whom he obtained this information. Donnellan speculated that it might have been information he received from dispatch but that he did not know. Donnellan acknowledged that Dumas never mentioned a gun to him when he interviewed her at Campbell's home (and there is no indication in the record that he even asked her about a weapon). The record likewise reflects that Dumas did not provide such information to the 911 operator or the EMS dispatcher during the 911 call. Accordingly, there is no evidence in the record that Jones, in fact, had a weapon or that Dumas believed (or told anyone) that he might have had access to a weapon.

is asked and answered that matters. Simply because Dumas had sustained serious injuries and Jones had not yet been apprehended did not render all of the statements she made while the police were questioning her non-testimonial. "'[A] conversation which begins as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements once the initial purpose has been achieved.'" *Bryant*, 562 U.S. at 365, 131 S.Ct. 1143, 179 L.Ed.2d 93, quoting *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224 (internal quotation marks omitted). Such an "evolution" may occur if "a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute" or "if a perpetrator is disarmed, surrenders, is apprehended, or * * * flees with little prospect of posing a threat to the public." *Bryant* at 365.

{¶ 127} Although the state asserts that Donnellan's questions were directed to "mounting" an "effective police response," only the first of Donnellan's questions to Dumas — i.e., whether the alleged assailant was still in Dumas' house — bore any relationship to assessing whether there might be an existing risk to police (or to anyone else).[26] Donnellan's remaining questions were directed to investigating and

---

[26] For example, Donnellan did not ask Dumas whether there were any weapons in the home or whether Jones otherwise had access to any weapons; he did not ask Dumas where in the house the fire had been set and he did not ask Dumas whether anyone other than Jones was in the house. Although the state asserts that "the identity of the perpetrator" was important "to elicit an effective police response," the officers' actions belie this claim. There is no evidence in the record that officers did anything with this information once they learned of Jones' identity to assess whether he posed an immediate risk to officers or to the public. Further, even if Jones' identity were relevant to police or

documenting what had happened — i.e., determining the identity of Dumas' alleged assailant, inquiring whether he had "dumped the gas on [her] in the house" and inquiring as to how the alleged assailant had entered her home.[27] These elicited statements were not "necessary to be able to *resolve* [a] present emergency," but rather "to learn * * * what had happened in the past." (Emphasis sic.) *Bryant* at 367.

{¶ 128} Viewed objectively, the totality of the relevant circumstances surrounding Donnellan's interview of Dumas demonstrates that the "primary purpose" of Dumas' statements — made in response to Donnellan's inquiries — in which she identified Jones as her assailant and described what he had done, was to provide an account of the assault that had allegedly occurred — i.e., to document past events for purposes of a later criminal investigation or prosecution — and were, therefore, testimonial. Dumas's statements to Donnellan were simply "'a weaker substitute for live testimony' at trial." *Davis* at 828, quoting *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986); *cf. Smith*, 2019-Ohio-3257, 141 N.E.3d 590, at ¶ 13 (declarant's statements were testimonial where police did not "focus on any exigent threat or safety concern in their questioning" but rather "asked about what had happened, rather than what was happening, procuring information about the past course of events, which then led to the charges against

---

public safety, Dumas had already identified Jones as her assailant and provided a description of him during the 911 call.

[27] It is also worth noting that at the time Donnellan was questioning Dumas, it had not yet been determined which officer would be the "primary" on the case, responsible for investigating and writing the report regarding the incident.

[defendant]"); *Toledo v. Green*, 2015-Ohio-1864, 33 N.E.3d 581, ¶ 21-25 (6th Dist.) (where victim and alleged perpetrator were in separate rooms, the victim "seemed a little upset" and "was a little bit loud" when police arrived and there was no bona fide physical threat to the victim at the time of her statements to police, no ongoing emergency existed and victim's statements to police were testimonial); *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 156-159 (witness' statements to police were testimonial where witness called police to report that her husband had confessed to killing a woman, witness was not at an active crime scene, no gun was involved in the murder and although police were still trying to identify and apprehend an at-large perpetrator, who "initially * * * appeared to pose a continuing threat to [witness] and maybe others," police contact with witness was "did not occur in the midst of an ongoing emergency").

{¶ 129} The fact that Dumas' statements to Donnellan were presented through both Donnellan's testimony and the playing of Donnellan's body camera footage for the jury does not alter our analysis. The purpose of body cameras is to record events in which law enforcement officers are involved to improve officer safety, increase evidence quality, reduce civilian complaints and reduce agency liability, *see* Hyland, Bureau of Justice Statistics, *Body-Worn Cameras in Law Enforcement Agencies, 2016* (Nov. 2018) — not to supplant the in-court testimony of witnesses. Out-of-court statements that would otherwise be inadmissible do not become admissible simply because they were captured on a police body camera. Under circumstances like those here, statements recorded by police body cameras

cannot be used either to supplement the testimony of a witness or as a substitute for the testimony of a witness.

{¶ 130} Because Dumas' statements were testimonial and Jones did not have an opportunity to cross-examine Dumas regarding those statements, the trial court's admission of those statements violated the Confrontation Clause.[28]

### c. Dumas' Statements to Potchatek and Strehle

{¶ 131} The trial court also admitted evidence of (1) statements Dumas made during a brief exchange with Potchatek while Dumas was in the back of the ambulance waiting to be transported to the hospital and (2) statements Dumas made during an extended interview with Potchatek and Strehle while she was "being treated" at the hospital in the emergency bay. When Potchatek's attempted interview of Dumas in the back of the ambulance was interrupted by EMS personnel so Dumas could be transported to the hospital, the officers followed Dumas to the hospital and continued the interview there.

{¶ 132} As with Dumas' statements to Donnellan, Dumas' statements to Potchatek and Strehle were made after Dumas had left her house, was separated from her alleged assailant, was "safe and out of danger" and was in the custody, and under the care, of medical providers. By the time Potchatek began questioning

---

[28] Because we find that Dumas' statements to Donnellan (and, as discussed below, her statements to Potchatek, Strehle and Sims) identifying Jones as her assailant and describing what he had done were testimonial and that admission of those statements violated Jones' rights under the Confrontation Clause, we need not (and do not) address whether the statements were otherwise admissible, under the rules of evidence, as excited utterances or under some other hearsay exception.

Dumas in the ambulance, Dumas' house had been cleared and the scene had been secured. Although Jones had not yet been apprehended and his whereabouts were unknown when Potchatek was questioning Dumas in the ambulance, there is nothing in the record to suggest that anyone was concerned that Jones might have a weapon or otherwise believed Jones posed a risk to the public or to police at that point. Any emergency had clearly ended. Thus, the circumstances of the interview reflect that police "had moved from their purpose as first responders in this case — locating the victim, evaluating her injuries, and securing the scene — to their purpose of criminal investigation" before Potchatek's interview began. *State v. Akers*, 5th Dist. Delaware No. 20 CAC 08 0033, 2021-Ohio-2562, ¶ 24. Objectively considering the totality of the relevant circumstances, Dumas' statements to Potchatek in the ambulance were testimonial.

{¶ 133} Jones returned to the scene (and was then arrested) while Potchatek and Strehle were questioning Dumas at the hospital. Donnellan advised Potchatek of Jones' return and arrest during that interview as the officers relayed information back and forth between the scene and the hospital. At the hospital, the officers spoke with Dumas "at great length," and used the interview as "an investigative means" to elicit detailed information from Dumas about what had occurred.

{¶ 134} Viewed objectively, the totality of the relevant circumstances surrounding Potchatek and Strehle's interview of Dumas at the hospital, including the formality of the interview, the length of the interview, its "investigative purpose," Dumas' status and the status of the scene, demonstrate that the "primary purpose"

— if not the only purpose — of Potchatek and Strehle's interrogation of Dumas was to document past events for purposes of a later criminal investigation or prosecution. Once again, Dumas' statements to Potchatek and Strehle were simply "'a weaker substitute for live testimony' at trial." *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224, quoting *Inadi*, 475 U.S. at 394, 106 S.Ct. 1121, 89 L.Ed.2d 390. As such, they were testimonial.

{¶ 135} Because Dumas' statements to Potchatek and Strehle were testimonial and because Jones did not have an opportunity to cross-examine Dumas regarding those statements, the trial court's admission of those statements at trial violated the Confrontation Clause.

### d. Dumas' Statements to Sims

{¶ 136} Finally, the trial court admitted testimony from Sims regarding statements Dumas had made to him on approximately four occasions at the hospital and another three occasions while she was in a nursing facility. Although Sims did not identify the dates and times of any of his conversations with Dumas, it is clear that his questioning of Dumas was far removed from any emergency. Sims readily acknowledged that his purpose in questioning Dumas was his "continuing investigation," i.e., "to make sure * * * her statement was the same" as to "who had done this, committed this crime against her." Accordingly, Dumas' statements to Sims were testimonial.

{¶ 137} Because Dumas' statements to Sims were testimonial and Jones did not have an opportunity to cross-examine Dumas regarding those statements, the trial court's admission of those statements violated the Confrontation Clause.

## B. Harmless Error

{¶ 138} Having determined that the trial court erred in admitting evidence of Dumas' statements to Donnellan, Potchatek, Strehle and Sims, we must now consider whether that error was reversible error or harmless error. *Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, at ¶ 178 ("Confrontation Clause claims are * * * subject to harmless-error analysis."), citing *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 192.

{¶ 139} Crim.R. 52(A) addresses harmless error in the context of criminal cases. It provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also* R.C. 2945.83(C) ("No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of * * * [t]he admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby."). Under the harmless error standard of review, the state bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 55; *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. Neither party addressed the issue of harmless error in their appellate briefs.

{¶ 140} In *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, the Ohio Supreme Court set forth a three-part analysis "to guide appellate courts" in determining whether an error in the admission of evidence has affected the substantial rights of a defendant, thereby requiring a new trial, or whether admission of that evidence was harmless error:[29]

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*Morris*] at ¶ 25, 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.

*State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37; *see also State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 63.

{¶ 141} "[W]hile courts may determine prejudice in a number of ways and use language that may differ, * * * both the nature of the error and the prejudice to defendant (the measure of how the error affected the verdict) are important." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 25, 33. As such, when determining whether a new trial is required or error is harmless beyond a reasonable doubt, "an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence." *Morris* at ¶ 33. Error in the admission of evidence is harmless beyond a reasonable doubt when "'there is [no] reasonable possibility that the improperly admitted

---

[29] In *Morris*, the Court "dispensed with the distinction between constitutional and nonconstitutional errors under Crim.R. 52(A)." *Harris* at ¶ 37, citing *Morris* at ¶ 22-24.

evidence contributed to the conviction.'" *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 192, quoting *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *see also State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78 ("Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.").

{¶ 142} Applying this analysis to the evidence in this case, we find that the erroneous admission of Dumas' statements to Donnellan, Potchatek, Strehle and Sims was harmless error and did not affect Jones' substantial rights.

{¶ 143} "Errors can be harmless * * * if the evidence is cumulative of other properly admitted evidence." *State v. Calhoun*, 9th Dist. Summit No. 29604, 2021-Ohio-1713, ¶ 15, citing *State v. Arnold*, 10th Dist. Franklin No. 07AP-789, 2010-Ohio-5622, ¶ 8, citing *Conway* at ¶ 59; *cf. State v. Wallace*, 8th Dist. Cuyahoga No. 109847, 2021-Ohio-4612, ¶ 33 ("the erroneous admission of inadmissible hearsay that is cumulative to properly admitted testimony constitutes harmless error"), quoting *Peffer v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 94356, 2011-Ohio-450, ¶ 28; *Merritt*, 2016-Ohio-4693, 69 N.E.3d 102, at ¶ 11 (concluding that where one officer's testimony regarding the victim's statements was admissible, any error in the admission of another officer's "duplicative testimony" would be harmless error).

{¶ 144} Following a thorough review of the record before us, considering both the potential impact of the improperly admitted evidence on the verdict and the strength of the remaining evidence after the improperly admitted evidence is removed from consideration, we are compelled to find that the trial court's erroneous admission of this evidence did not contribute to Jones' convictions, was harmless beyond a reasonable doubt and did not affect Jones' substantial rights.

{¶ 145} Although the improperly admitted evidence of Dumas' statements to Donnellan, Potchatek, Strehle and Sims (including the body camera footage capturing those statements) linked Jones to the crimes of which he was ultimately convicted, that improperly admitted evidence was duplicative and cumulative of the other, properly admitted evidence of Dumas' statements to Campbell, the 911 operator and the EMS dispatcher.[30] Excising the improperly admitted evidence, an abundance of credible evidence remains that supports the jury's guilty verdicts on the offenses of which Jones was convicted beyond a reasonable doubt.

---

[30] In considering whether the trial court's admission of Dumas' statements was harmless error, we are mindful that Jones stipulated to the admissibility of Dumas' medical records, which includes an "emergency department – visit note" authored by Dr. Julia Coppi, recording a "history * * * provided by the Patient and EMS" that includes a description of the incident. It is unclear from the record what information came from EMS as opposed to Dumas, the source of the information provided by EMS and when the information "provided by the Patient" was provided, i.e., whether it was provided during Potchatek and Strehle's interview of Dumas while she was being treated at the hospital. Because it appears from the record that that stipulation was made only after the trial court denied Jones' motion in limine and admitted, over Jones' objections, Potchatek's testimony regarding the statements Dumas had made at the hospital, we do not consider Jones' stipulation to the admissibility of the medical records as part of our harmless error analysis.

{¶ 146} The properly admitted evidence establishes that following the incident, Dumas went directly from her home to Campbell's home, where Dumas told her neighbor and long-time acquaintance, Campbell, that she needed to get to the hospital because "Kelly had thrown fire on her." A few minutes later, Dumas told the 911 operator that Kelly Jones, "[t]his guy I let stay in my house" "'cuz he didn't have nowhere to stay," "came in all looped out, high, and * * * went crazy on me," "threw gasoline and something on me trying to burn my mother's house down" and "[s]et me on fire," burning her face, arms and chest. Dumas told the EMS dispatcher, "I've been set on fire and I'm burning up. * * * I'm at my neighbor's right now 'cuz he was still in the house when I left out of there. * * * He set me on fire." The physical evidence officers found at the scene was, in significant part, consistent with and supported Dumas' version of events as described to Campbell, the 911 operator and the EMS dispatcher.

{¶ 147} The statements Dumas made to Donnellan, Potchatek, Strehle and Sims identifying Jones as her assailant and describing what occurred were simply a retelling, using slightly different language, of what Dumas had already told Campbell, the 911 operator and the EMS dispatcher. There is nothing in the record to suggest that anything rendered the statements Dumas made further in time from the incident (to Donnellan, Potchatek, Strehle and Sims) more credible than the statements she made closer in time to the incident (to Campbell, the 911 operator and the EMS dispatcher). As such, we cannot say that there is any "reasonable

possibility" that the improperly admitted evidence prejudicially contributed to Jones' convictions.

{¶ 148} It should be noted, however, that we reluctantly reach this result. Based on the current state of the law, we are compelled to find that evidence of Dumas' statements to Campbell, the 911 operator and the EMS dispatcher were admissible. Further, based on the admissibility of that evidence and the record before us, we are unable to find that the erroneous admission of the police officers' testimony and body camera footage of Dumas' statements to the officers is anything but harmless error.

{¶ 149} We recognize, however, that it was only through the out-of-court statements of Dumas, who did not testify at trial, that the state was able to convict Jones. Dumas' unsworn, untested statements were the sole source of nearly every fact needed to support Jones' guilty verdicts. The record reflects that defense counsel stated, "We have been briefed in chambers as to the reason that [Dumas] would be unavailable for attendance at trial." Unfortunately, the content of that in-chambers conversation is not part of the record.

{¶ 150} In this case, the defendant was convicted and sentenced to a lengthy prison term (1) without any opportunity to confront and cross-examine the declarant whose unsworn, out-of-court statements gave rise to his convictions and (2) without any evidence in the record establishing that that declarant was unable or otherwise unavailable to testify at trial. It is axiomatic that defendants have a right, under both the United States and Ohio Constitutions, to confront the

witnesses against them.  The blatant circumvention of this constitutional right by the state of Ohio — which this court is repeatedly and frequently encountering — is disconcerting.

{¶ 151} The Cuyahoga County Prosecutor's Office has made it a practice to proceed with "victimless prosecutions."  *See* the state's oral argument in *State v. Johnson*, Appeal No. 110942.[31]  This practice is reprehensible.  Although it may very well be "easier to go without the victim in these cases," *see* the state's oral argument in *State v. Smith*, Appeal No. 111274, this practice undermines "the basic objective of the Confrontation Clause," which is "to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial."  *Bryant*, 562 U.S. at 358, 131 S.Ct. 1143, 179 L.Ed.2d 93.

{¶ 152} Constrained by existing law from reaching a different result, we overrule Jones' first assignment of error.

### C. Sufficiency of the Evidence

{¶ 153} In his second assignment of error, Jones argues that the trial court erred in denying his Crim.R. 29(A) motion for acquittal as to all charges.

{¶ 154} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence.  *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13.  Crim.R. 29(A) mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense.  Crim.R. 29(A) (the

---

[31] Pursuant to App.R. 21(J), recordings of these oral arguments are available for review upon request.

trial court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses"); *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21. Accordingly, we apply the same standard of review to a trial court's denial of a defendant's motion for acquittal as we use when reviewing sufficiency of the evidence. *State v. Nicholson*, 8th Dist. Cuyahoga No. 110595, 2022-Ohio-2037, ¶ 141, citing *Taylor* ¶ 21-23 ("Crim.R. 29(A) and sufficiency of evidence review require the same analysis.").

{¶ 155} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 156} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element

of the crime"). The appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 157} Jones contends that all his convictions should be vacated because (1) "[t]here simply is not the requisite evidence that Appellant committed these crimes" and (2) Jones was not shown to have had a motive for committing any crime against Dumas. He further contends that there was insufficient evidence to convict him of aggravated arson in violation of R.C. 2909.02(A)(1) because there was no evidence of "fire" or "explosion."[32]

{¶ 158} Jones was convicted of four offenses: (1) aggravated arson in violation of R.C. 2909.02(A)(1) (Count 1); felonious assault in violation of R.C. 2903.11(A)(1) (Count 3); arson in violation of R.C. 2909.03(A)(1) (Count 5) and domestic violence in violation of R.C. 2919.25(A) (Count 6).

{¶ 159} R.C. 2909.02(A)(1), aggravated arson, states: "No person, by means of fire or explosion, shall knowingly * * * [c]reate a substantial risk of serious physical harm to any person other than the offender." R.C. 2903.11(A)(1), felonious

---

[32] Although Jones' conviction for arson in violation R.C. 2903.03(A)(1) (Count 5) also has "by means of fire or explosion" as an element of the offense, in his appellate brief, Jones only specifically challenges his conviction for aggravated arson (Count 1) and not his conviction for arson (Count 5) on that basis.

assault, states, in relevant part: "No person shall knowingly * * * [c]ause serious physical harm to another." R.C. 2909.03(A)(1), arson, states: "No person, by means of fire or explosion, shall knowingly * * * [c]ause, or create a substantial risk of, physical harm to any property of another without the other person's consent."[33] R.C. 2919.25(A), domestic violence, states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." A person acts knowingly "when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 160} Following a thorough review of the record, viewing the evidence in the light most favorable to the state, we conclude that the state presented sufficient evidence for a reasonable jury to find Jones guilty of each of these offenses beyond a reasonable doubt and that the trial court, therefore, did not err in denying his Crim.R. 29(A) motion.

{¶ 161} A conviction may rest solely on the testimony of a single witness, including the victim, if believed. *See, e.g., Nicholson*, 2022-Ohio-2037, at ¶ 148; *State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Dudley*, 9th Dist. Summit No. 28364, 2017-Ohio-7044, ¶ 10.

{¶ 162} Proof of motive or reason for causing harm is not required to support a conviction. *See, e.g., Nicholson* at ¶ 183; *State v. Kemp*, 8th Dist. Cuyahoga No.

---

[33] For a violation of R.C. 2903.03(A)(1) to constitute a fourth-degree felony, as charged in this case, "the value of the property or the amount of the physical harm involved" must be "one thousand dollars or more." *See* R.C. 2903.03(D)(2)(b). Because Jones does not specifically challenge the sufficiency of the evidence establishing this element, we do not further address it here.

97913, 2013-Ohio-167, ¶ 47 (state's failure to establish a clear motive was not a sufficient basis upon which to reverse defendant's convictions; "'proof of motive does not establish guilt, nor does want of proof thereof establish innocence; and, where the guilt of the accused is shown beyond a reasonable doubt, it is immaterial what the motive may have been for the crime, or whether any motive is shown'"), quoting *State v. Allen*, 8th Dist. Cuyahoga No. 85530, 2005-Ohio-4813, ¶ 15.

{¶ 163} Here, Dumas' assailant was well known to her. The state presented evidence that Dumas told Campbell that "Kelly" had "thrown fire" on her. The state presented evidence that Dumas told the 911 operator that "the guy I let stay in my house," "Kelly Jones," "is going crazy and throwed gasoline and something on me trying to burn my mother's house down" and "[s]et me on fire" and that she told the EMS dispatcher, "I've been set on fire and * * * I'm at my neighbor's right now 'cuz he was still in the house when I left out of there. * * * He set me on fire."

{¶ 164} Dr. Brandt testified that Dumas had sustained life-threatening second-degree and third-degree burns to 16.5 percent of her body. Further, the police officers and fire investigator testified that they had observed signs of a recent fire in the front bedroom, including observing burnt paper and a burnt lampshade and smelling a strong chemical odor, burnt paper and burnt plastic, when they inspected Dumas' home shortly after the incident. Jones does not dispute that the fire created a substantial risk of serious physical harm to Dumas, that Dumas sustained serious physical harm as a result of the incident or that he was a member of Dumas' household at the time the incident occurred.

{¶ 165} The evidence presented at trial was sufficient to establish each of the elements of each of the offenses of which Jones was convicted, including the "fire or explosion" element of R.C. 2902.02(A)(1). Further, although the state was not required to prove motive or a reason for Jones' conduct to sustain his convictions, Dumas told the 911 operator that Jones "came in all looped out, high" on drugs and "went crazy on me," which could reasonably explain why he attacked Dumas.

{¶ 166} Jones' second assignment of error is overruled.

### D. Manifest Weight of the Evidence

{¶ 167} In his third assignment of error, Jones asserts that all his convictions should be vacated because they are against the manifest weight of the evidence. Specifically, Jones argues that his convictions are against the manifest weight of the evidence because (1) "[t]here is no worthy or independent corroborative evidence that Appellant caused [Dumas'] injuries," (2) Jones "never acknowledged or admitted to causing any injury to [Dumas]" and told the police that Dumas had attacked him, (3) Dumas "could have and probably caused those injuries to herself, accidentally or otherwise," (4) the responding officers had discussed whether the fire was accidental and (5) based on Potchatek's statements that Dumas was "crazy" and had "serious dementia."

{¶ 168} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "'[W]eight of the evidence involves the

inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 169} As stated above, a conviction may rest solely on the testimony of a single witness, if believed, and there is no requirement that a witness' testimony be corroborated to be believed. *See, e.g., Nicholson*, 2022-Ohio-2037, at ¶ 180; *Flores-Santiago*, 2020-Ohio-1274, at ¶ 38; *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 43 (8th Dist.); *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 84 (4th Dist.). Likewise, a conviction is not against the manifest weight of the evidence "solely because the jury heard inconsistent or contradictory testimony." *State v.*

*Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 72, citing *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38; *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 45 (8th Dist.) ("A defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory.").

{¶ 170} Although Campbell and Potchatek testified that Dumas had "dementia" or some type of mental deficiency or cognitive difficulty prior to the incident, no medical evidence was presented regarding Dumas' mental state at the time of the incident, there was no evidence that Dumas had been diagnosed with any medical or mental condition prior to the incident and there was no evidence that any mental deficiency or cognitive difficulty Dumas may have been experiencing had impacted her ability to accurately perceive, recall or relate what had occurred or at or around the time of the incident. Campbell testified that Dumas was "calm" and "well put together" when she spoke with Dumas shortly after the incident. Although Dumas was certainly in distress when speaking with the 911 operator and EMS dispatcher, it is clear from the recording of the 911 call that Dumas had no difficulty in communicating with the 911 operator and the EMS dispatcher and answered their questions in a reasonable, clear and concise manner. Donnellan testified that he saw no signs of any "mental issues" when he spoke with Dumas and, despite his prior concerns regarding Dumas' mental condition, Potchatek testified that Dumas was not "manifesting" any "psych issues" when he spoke with her following the incident. There is nothing in the record that would preclude the jury from reasonably

believing Dumas' statements to Campbell, the 911 operator and the EMS operator regarding what had occurred, had they chosen to do so.

{¶ 171} As a general matter, a jury is free to believe all, some or none of the testimony of each witness testifying at trial. *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85; *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 100. The jury heard evidence of (1) Dumas' statements to Campbell, the 911 operator and the EMS dispatcher that Jones had thrown fire on her, causing her burn injuries, and (2) Jones' statements to police that Dumas had attacked him. It was free to determine the credibility of those statements. Further, although the police officers had initially discussed whether the fire may have been "accidental," each officer testified that he ultimately concluded, after further investigating the incident, e.g., after hearing Dumas' description of the incident, seeing her injuries, examining the scene and/or interacting Jones, that Dumas' injuries resulted from Jones' intentional conduct.

{¶ 172} Jones' convictions were not against the manifest weight of the evidence merely because the trial court believed Dumas and the testimony of the state's witnesses regarding what had occurred over Jones' version of events, where, as here, the jury could reasonably make that choice. *See, e.g., State v. Nash*, 1st Dist. Hamilton Nos. C-210435 and C-210436, 2022-Ohio-1516, ¶ 13 ("[A] conviction is not against the weight of the evidence merely because the [fact finder] did not believe the defense testimony."); *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 13 ("We will not overturn a conviction as being against the

manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version."); *State v. Chatman*, 10th Dist. Franklin No. 08AP-803, 2009-Ohio-2504, ¶ 34 ("[A] conviction is not against the manifest weight of the evidence simply because the trier of fact chose to believe the prosecution's witnesses and to not believe appellant.").

{¶ 173} Following a thorough review of the record, weighing the strength and credibility of the evidence presented and the reasonable inferences to be drawn therefrom, we cannot say that this is one of those "'exceptional cases'" in which the trier of fact clearly lost its way and created a manifest miscarriage of justice that the defendant's convictions must be reversed. *Thompkins* at 387, quoting *Martin* at 175. We overrule Jones' third assignment of error.

### E. Allied Offenses of Similar Import

{¶ 174} In his fourth assignment of error, Jones argues that the aggravated arson and felonious assault offenses[34] of which he was convicted are allied offenses of similar import and should have been merged for sentencing. R.C. 2941.25, Ohio's allied-offenses statute, states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate

---

[34] Jones has not claimed on appeal that his arson or domestic violence convictions should have merged for sentencing with any other offenses. Accordingly, we do not address those offenses here.

animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 175} In determining whether offenses are subject to merger for sentencing under R.C. 2941.25, courts evaluate three separate factors — the import, the conduct and the animus. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraphs one and three of the syllabus. Offenses do not merge, and a defendant may be convicted of and sentenced for multiple offenses if any one of the following is true: (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately or (3) the offenses were committed with separate animus or motivation. *Id*. at paragraph three of the syllabus, ¶ 25, 31. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18; *see also State v. Davids*, 8th Dist. Cuyahoga No. 110890, 2022-Ohio-2272, ¶ 43; *State v. Burey*, 8th Dist. Cuyahoga No. 109629, 2021-Ohio-943, ¶ 17.

{¶ 176} Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. Thus, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other

offense." *Id.* at ¶ 26. "The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import." *Id.*

{¶ 177} Offenses are committed separately within the meaning of R.C. 2941.25(B) if "'one offense was complete before the other offense occurred, * * * notwithstanding their proximity in time and that one [offense] was committed in order to commit the other.'" *State v. Woodard*, 2d Dist. Montgomery No. 29110, 2022-Ohio-3081, ¶ 38, quoting *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. Thus, "'when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts.'" *Woodard* at ¶ 38, quoting *State v. Mooty*, 2014-Ohio-733, 9 N.E.3d 443, ¶ 49 (2d Dist.).

{¶ 178} For purposes of R.C. 2941.25(B), animus has been defined as "'"purpose or more properly, immediate motive."'" *State v. Priest*, 8th Dist. Cuyahoga No. 106947, 2018-Ohio-5355, ¶ 12, quoting *State v. Bailey*, 8th Dist. Cuyahoga No. 100993, 2014-Ohio-4684, ¶ 34, quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). "'If the defendant acted with the same purpose, intent, or motive in both instances, the animus is identical for both offenses.'" *State v. Lane*, 12th Dist. Butler No. CA2013-05-074, 2014-Ohio-562, ¶ 12, quoting *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 13. "Animus is often difficult to prove directly, but must be inferred from the surrounding circumstances." *Lane* at ¶ 12, citing *State v. Lung*, 12th Dist. Brown No. CA2012-03-004, 2012-Ohio-5352, ¶ 12. We review de novo whether two offenses are allied

offenses of similar import. *Burey*, 2021-Ohio-943, at ¶ 17, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 179} As stated above, aggravated arson under R.C. 2909.02(A)(1) occurs where a person "by means of fire or explosion" "knowingly * * * [c]reate[s] a substantial risk of serious physical harm to any person other than the offender." Felonious assault under R.C. 2903.11(A)(1) occurs where a person "knowingly * * * [c]ause[s] serious physical harm to another."

{¶ 180} At the sentencing hearing, the trial court rejected Jones' arguments that the aggravated arson and felonious assault claims were allied offenses of similar import based on a belief that the setting of the fire that led to the burning of the lampshade and paper and the fire that led to Dumas' injuries were "separate and distinct act[s]" that occurred at "separate and distinct time[s]":

> THE COURT: He was convicted by this jury of aggravated arson. There was a suggestion that he lit portions of the house on fire, too. * * * Whether it was before or after is somewhat irrelevant. There was also testimony that he attempted to damage the automobile * * * and light the car on fire and that there was a candle that was found on the hood of the automobile, so I do not believe that these separate acts merge with the felonious assault that you're mentioning.
>
> The felonious assault on the victim where he sprayed her with a flammable liquid and then lit her on fire I believe is a separate and distinct act that occurred at a separate and distinct time. * * * I have reviewed the facts and circumstances contained in this case and I wholeheartedly concur with the finding of the jury that there is a separate count for aggravated arson, a felony of the first degree, that he has been convicted of.
>
> * * *

I believe that there are separate and distinct acts for this reason: I believe the testimony from the police officers, it was when they talked to the victim, Ernestine Dumas, and she indicated she was watching TV in her home on the day in question when Jones came over "high on everything," * * * and he began to spray a clear liquid from a bottle and then light the liquid on fire.

Jones lit — and this is the testimony that I recall — the lamp on fire. That is an act of arson, a separate and distinct act of arson.

Dumas tried to put the fire out and in part she was burned on her arms and hands. It was thereafter that Jones then sprayed the victim with an unknown flammable liquid and lit her afire.

Those are the facts and circumstances that this Court recalls. I believe that is the testimony in this case. I believe that establishes a clear, separate animus and, therefore, there is no merger of the counts mentioned.

{¶ 181} As detailed above, however, there was no testimony at trial that Dumas was first "burned on her arms and hands" when she "tried to put the out fire out" after Jones "lit * * * the lamp on fire" and that Jones "then later sprayed [Dumas] within an unknown flammable liquid and lit her on fire" "at a separate and distinct time." The evidence presented at trial does not support the trial court's version of what occurred in deciding that the aggravated arson and felonious assault offenses were not allied offenses of similar import.

{¶ 182} At the sentencing hearing, the state was initially willing to concede that the aggravated arson and felonious assault offenses merged for sentencing.[35]

---

[35] At the sentencing hearing, the assistant prosecuting attorney stated:

So with respect to the aggravated arson and the felonious assault, I don't believe the [s]tate can say in a way that will stand up to appellate review that they had a separate animus. Typically[,] aggravated arson, for example, if you set fire to the house, certainly that would be separate animus to a

However, the state ultimately deferred to the trial court's determination that the aggravated arson and the felonious assault offenses were not allied offenses of similar import. On appeal, the state argues that the aggravated arson and felonious assault offenses do not merge because "the force" Jones used to commit aggravated arson was "far in excess" of that required to commit the offense and Jones, therefore, had a separate animus[36] to knowingly cause Dumas serious physical harm after he completed the aggravated arson offense by "means of fire" knowingly created a substantial risk of serious physical harm to Dumas. The state explains its argument as follows:

> Aggravated arson is a completed offense when a person doused in a flammable liquid is merely exposed to an open flame. Taking the extra step to ignite another person is far in excess of the force necessary to effect an aggravated arson and thus shows a separate animus for the felonious assault. Offenses with a separate animus may be sentenced separately. * * * [O]nce Ms. Dumas had been sprayed by the flammable liquid, the aggravated arson was complete as soon as she was in the presence of an open flame. * * * The act of bringing the flame close enough to Ms. Dumas to ignite her is far in excess of the force necessary to effectuate an aggravated arson. There was a separate animus to knowingly cause Ms. Dumas serious physical harm, not merely an intent to place her at substantial risk of it. The felonious assault was the act of setting fire to the flammable liquid Appellant sprayed on to Ms. Dumas's body, not merely endangering her by having an open flame in her presence. Because igniting Ms. Dumas represents a separate animus than merely placing her at risk of serious physical

felonious assault. But in this case, like, he used the fire to cause the serious physical harm.

     While there are not a lot of cases on the issue, the ones we do have would indicate that I don't think that we can argue the separate animus there, so we would, I guess, submit to the Court that they might merge.

[36] The state does not dispute that the offenses involved the same conduct and import.

harm due to her presence near an open flame, aggravated arson and felonious assault do not merge.

{¶ 183} In support of its argument, the state cites *State v. Albert*, 10th Dist. Franklin No. 14AP-30, 2015-Ohio-249. That case, however, is readily distinguishable from this case. In *Albert*, the defendant, Albert, and another male, Taylor, began beating the victim after he refused to answer questions regarding a shooting that had occurred two days earlier. *Id.* at ¶ 2-3. Albert said that he knew how to get the victim to talk, then left the room and returned with a gasoline can. *Id.* at ¶ 3. Albert poured gasoline on the victim, and Taylor lit a piece of paper on fire to intimidate the victim to answer their questions. *Id.* When the lit piece of paper started burning Taylor's hand, Taylor either tossed or accidentally dropped the lit paper into the victim's lap and the victim became engulfed in flames. *Id.* at ¶ 3 and fn. 2. The victim sustained burns over 95 percent of his body and died from the massive burns and soot inhalation into his lungs. *Id.* Albert was convicted of aggravated arson, felony murder and kidnapping as a result of the incident. *Id.* at ¶ 6.

{¶ 184} On appeal, Albert argued that his convictions should have been merged for sentencing. The Tenth District rejected Albert's claim as it related to the merger of the kidnapping offense and either aggravated arson or murder, concluding that separate conduct was required to commit each of the offenses and that the two men had restrained the victim's liberty to terrorize him by initially standing over him and beating him. *Id.* at ¶ 24.

{¶ 185} With respect to the murder and aggravated arson offenses, the court found that offenses were committed with the same conduct because the victim had died as the result of being set on fire. *Id.* at ¶ 25. However, the court held that Albert's intent to kill victim (supporting the murder conviction) was separate from his intent to cause the victim serious harm by means of fire (supporting the aggravated arson conviction) "because the act of pouring gasoline on [the victim] and then lighting him on fire was far in excess of the force needed to commit aggravated arson * * * and, given the circumstances, indicates that appellant participated in an act with a separate animus to kill [the victim]." *Id.* at ¶ 28. Accordingly, the court held that the trial court did not err when it did not merge these offenses for sentencing. *Id.*

{¶ 186} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct" and "an offense may be committed in a variety of ways." *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 26, 30. "[T]his analysis may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct — an inherently subjective determination." *Ruff* at ¶ 32, quoting *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 52 (plurality opinion per Brown, C.J.).

{¶ 187} The "circumstances" of this case are different from those in *Albert*. Here there is nothing — given the limited facts in the record regarding what actually

occurred — to reasonably support the state's theory that Jones first sprayed Dumas with flammable liquid "in the presence of an open flame" with the intent "by means of fire or explosion [to] knowingly create a substantial risk of serious physical harm" and that he then "[brought] the flame close enough to Ms. Dumas to ignite her" with the separate intent to "knowingly cause [her] serious physical harm." Based on the evidence presented at trial, it is unknown what served as the ignition source in this case or precisely how it came to be that Jones set Dumas on fire. None of the police officers nor the fire investigator could identify the ignition source. Dumas stated only that Jones had "thrown fire on her" and had "set [her] on fire." Accordingly, under the facts and circumstances here, we find that the aggravated arson and felonious assault offenses were allied offenses involving the same conduct, import and animus and should have been merged for sentencing.

{¶ 188} We, therefore, vacate Jones' sentences on Counts 1 and 3 and remand for a new sentencing hearing on those counts. On remand, the trial court shall merge these offenses for sentencing, the state shall elect the offense on which it wishes Jones to be sentenced and the trial court shall impose a sentence that is appropriate for that offense.

{¶ 189} Jones' fourth assignment of error is sustained.

**F. Imposition of Consecutive Sentences**

{¶ 190} In his fifth assignment of error, Jones argues that his consecutive sentences should be vacated and modified to concurrent sentences because the trial court (1) did not make all the requisite findings at the sentencing hearing to support

the imposition of consecutive sentences under R.C. 2929.14(C)(4) and (2) did not

set forth such findings in its sentencing journal entry.[37]

{¶ 191} To impose consecutive sentences on felony offenses, a trial court

must find that (1) consecutive sentences are necessary to protect the public from

future crime or to punish the offender, (2) consecutive sentences are not

disproportionate to the seriousness of the offender's conduct and to the danger the

offender poses to the public and (3) at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).  The trial court must make each finding required under R.C.

2929.14(C)(4) at the sentencing hearing and then incorporate those findings into its

---

[37] In the section of his appellate brief addressing his fifth assignment of error, Jones also asserts — without discussion or citation to supporting legal authority — "[p]lus, any misdemeanor in this case has to be served concurrently."  The only misdemeanor conviction in this case was Jones' conviction for domestic violence (Count 6).  Jones has not assigned this as error.  Accordingly, we disregard it.  App.R. 12(A)(1)(b) ("On an undismissed appeal from a trial court, a court of appeals shall * * * [d]etermine the appeal on its merits on the assignments of error set forth in the briefs under App.R. 16, the record on appeal under App.R. 9, and, unless waived, the oral argument under App.R. 21."); *see also* App.R. 16(A).

sentencing journal entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus.

{¶ 192} Based on our resolution of Jones' fourth assignment of error, this assignment of error is moot. As this court explained in *State v. Nunez*, 8th Dist. Cuyahoga No. 102946, 2016-Ohio-812, ¶ 12:

> [W]here a matter is remanded for the merger of allied offenses, the consecutive nature of the sentence, if so imposed, is no longer intact because it is only after the judge has imposed a separate prison term for each offense that the judge may consider whether the offender shall serve those terms concurrently or consecutively. [*State v. Huber*, 8th Dist. Cuyahoga No. 98206, 2012-Ohio-6139, ¶ 24], citing *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 9. Thus, at a resentencing hearing in such a case, the trial court must first sentence the defendant on the merged offense or offenses before it may consider whether the prison terms should be served consecutively or concurrently. *Huber* at ¶ 24.

*See also State v. Gwynne*, Slip Opinion No. 2022-Ohio-4607, ¶ 12, 14-15 ("[W]hen a sentencing court makes the statutory findings under R.C. 2929.14(C)(4) for consecutive sentences, it must consider the number of sentences that it will impose consecutively along with the defendant's aggregate sentence that will result.").

{¶ 193} Accordingly, on remand, the trial court will again need to consider whether Jones' sentences should be served concurrently or consecutively and, if it determines that Jones' sentences should be served consecutively, it must make the findings required by R.C. 2929.14(C)(4) and set forth those findings in its sentencing journal entry.

## G. Sentencing under the Reagan Tokes Law

{¶ 194} In his sixth assignment of error, Jones contends that the trial court erred in sentencing him to an indefinite sentence on the aggravated arson count (Count 1) under the Reagan Tokes Law. Under the Reagan Tokes Law, qualifying first-and second-degree felonies committed on or after March 22, 2019 are subject to the imposition of indefinite sentences. Jones argues that the Reagan Tokes Law is unconstitutional because it violates his constitutional right to a trial by a jury, the separation-of-powers doctrine and his right to due process. Based on our resolution of Jones' fourth assignment of error, his sixth assignment of error is moot.

## H. Reopening Case

{¶ 195} In his seventh and final assignment of error, Jones asserts that the trial court erred in allowing the state to reopen its case to present additional evidence relating to the repeat violent specifications after rendering its verdict on matters not tried to the jury.

{¶ 196} As stated above, in this case, Jones elected to have the repeat violent offender specifications (along with the notice of prior conviction specifications) in Counts 1 and 3 tried to the bench. The remaining charges were tried to jury. After the jury's verdicts, the trial court found Jones guilty of the notice of prior conviction and repeat violent offender specifications. On the date scheduled for the sentencing hearing, the trial court withdrew its prior verdicts on the notice of prior conviction and repeat violent offender specifications, and, over Jones' objection, allowed the

state to present additional witness testimony and other evidence related to those specifications.

{¶ 197} As an initial matter, we note that Jones cites no legal authority and makes no argument in support of this assignment of error. He simply "submits" that the trial court's actions in allowing the state to reopen its case "was error, as the trial was already completed and there has to be some finality."

{¶ 198} An appellate court is not obliged to construct or develop arguments to support an assignment of error. *See, e.g., State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 56 (8th Dist.); *see also State v. Collins*, 8th Dist. Cuyahoga No. 89668, 2008-Ohio-2363, ¶ 91 ("'[I]t is not the duty of this Court to develop an argument in support of an assignment of error if one exists.'"), quoting *State v. Franklin*, 9th Dist. Summit No. 22771, 2006-Ohio-4569, ¶ 19. "'An appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2) if an appellant fails to cite to any legal authority in support of an argument as required by App.R. 16(A)(7).'" *State v. Fitz*, 8th Dist. Cuyahoga No. 109270, 2021-Ohio-1497, ¶ 8, quoting *In re N.P.*, 8th Dist. Cuyahoga Nos. 97846, 97847, 97848, 97849, 97850, 97851, 97852, 97853, 97854 and 97855, 2012-Ohio-4298, ¶ 43; *see also* App.R. 16(A)(7) ("The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."). For this reason alone, we could overrule this assignment of error.

{¶ 199} Further, we note that this court recently considered a similar issue in *State v. Heard*, 8th Dist. Cuyahoga No. 110722, 2022-Ohio-2266. In that case, the defendant elected to have a charge of having weapons while under disability, a repeat violent offender specification, a notice of prior conviction specification and firearm specifications tried to the bench. *Id.* at ¶ 5. A jury trial was held on the remaining counts. *Id.* Immediately after the trial court announced the jury's verdict, the trial court stated that it had found the defendant guilty of the charges and specifications that were to be tried to the bench. *Id.* at ¶ 18, 47. Nine days later, the trial court indicated that, at the time it had announced its verdicts on the having weapons while under disability charges, repeat violent offender specification and firearm specifications, it had been "laboring under the misimpression that the parties had stipulated to those charges." *Id.* at ¶ 19, 48. Over the defendant's objections, the trial court reopened the case and allowed the state to additional evidence. *Id.* at ¶ 49. Following the presentation of that evidence, the trial court, once again, found the defendant guilty of the having weapons while under disability charges, repeat violent offender specification and firearm specifications. *Id.*

{¶ 200} On appeal to this court, the defendant argued that by reopening the case, the trial court had violated his constitutional rights against double jeopardy. *Id.* at ¶ 50. This court rejected the defendant's argument, reasoning as follows:

> The decision whether to reopen a case for the presentation of additional evidence is within the discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *State v. Watson*, 8th Dist. Cuyahoga No. 70344, 1997 Ohio App. LEXIS 1110 (Mar. 20,

1997), ¶ 10; *Columbus v. Grant*, 1 Ohio App.3d 96, 97, 439 N.E.2d 907 (10th Dist.1981).

* * *

[T]he prohibition against * * * double jeopardy * * * "protects against three abuses": (1) "'a second prosecution for the same offense after acquittal,'" (2) "'a second prosecution for the same offense after conviction'" and (3) "'multiple punishments for the same offense.'" *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, quoting *N. Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

Here, we find none of these delineated "abuses" is implicated in this case. [The defendant] had not been acquitted, was not being prosecuted a second time for the same offenses, and the trial court had not meted out multiple punishments. The trial court had simply labored under the misimpression that there was a stipulation and rectified the matter by reopening the case to reconcile the record. Importantly, [the defendant] has not demonstrated any prejudice. As such, we find no abuse of discretion in the trial court's decision.

*Id.* at ¶ 51-53.

{¶ 201} Accordingly, we overrule Jones' seventh assignment of error.

{¶ 202} Judgment affirmed in part; reversed in part; individual sentences on Counts 1 and 3 vacated and consecutive sentences vacated. Case is remanded for a resentencing hearing at which the trial court shall merge the offenses in Counts 1 and 3 for sentencing, the state shall elect the offense on which it wishes Jones to be sentenced and the trial shall impose a sentence that is appropriate for that offense. On remand, the trial court shall also consider whether Jones' sentences should be served concurrently or consecutively and, if it determines that Jones' sentences

should be served consecutively, it shall make the findings required by R.C. 2929.14(C)(4) and incorporate those findings into its sentencing journal entry.

It is ordered that the appellant recover from appellee the costs herein taxed.

The court finds that there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN A. GALLAGHER, PRESIDING JUDGE

LISA B. FORBES, J., and
EMANUELLA D. GROVES, J., CONCUR